FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA    99 NOV 15  PM 3: 07
EASTERN DIVISION

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| ROLLEN JACKSON, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
|     vs. | ) | CV-98-PT-1851-E |
| | ) | |
| TALLADEGA COUNTY BOARD OF | ) | |
| EDUCATION, & DR. PEGGY | ) | |
| CONNELL, individually and as | ) | |
| Superintendent of the | ) | **ENTERED** |
| Talladega County Board of | ) | |
| Education, | ) | NOV 1 5 1999 |
| | ) | |
|     Defendants. | ) | |

### MEMORANDUM OPINION

This cause comes on to be heard on defendants' Motion for

Summary Judgment filed on September 8, 1999.  This action arises

out of defendants' alleged violations of plaintiff's First

Amendment right to free speech and violations of Title VII of the

Civil Rights Act of 1964 (42 U.S.C. § 2000e *et. seq.*), 42 U.S.C.

§§ 1981, 1981(a), and 42 U.S.C. § 1983.  Plaintiff alleges that

defendants terminated his teaching contract with the Talladega

County School system because of his race and because of a series

of complaints logged by plaintiff against the school district.

### I.  FACTS

The Talladega Board of Education ("the Board") hired Jackson

in 1977.  Jackson obtained tenure after three years and worked

for the Board until his termination in October of 1996.  The

Board employed Jackson as a welding instructor at Pittard High

School, a vocational high school.  Jackson received primarily

favorable performance evaluations for the entirety of his

tenure.[1]  Jackson also allegedly had the highest rate for finding

employment for his students of anyone in the school.

During his time employed by the Board, Jackson

intermittently engaged in spirited letter writing campaigns to

individual members of the Board regarding what Jackson considered

to be rampant racism within the Talladega School system.[2]  These

letters sometimes contained acerbic statements regarding the

letters' recipients personally.[3]  In November 1996, during the

_____

[1] From 1980 to January, 1984, Jackson received Excellent
evaluations.  From November 1984 to May, 1987, Jackson received
some Excellent, some Above Average, and some Average marks on
evaluations.  From December 1988 to May, 1996, under a different
grading scale, Jackson received a majority of Acceptable
evaluations in all or most subjects, and some Needs Improvement
marks.

[2] Most letters were directed towards Mr. McMurphy, then
Director of the Vocational Program at Pittard (white), Dr. Ed
Hall, then Assistant Superintendent (black), Dr. Grissett, then
Superintendent (white), and Eddie McLain, Board Chairman (white).

[3] These statements included calling certain individual Board
members "racist," a David Duke supporter, or "Grand Wizord [sic]
Director," "bigots," "liars," and having "Hitler views."  Copies

2

Talladega County Board of Education meeting regarding the
potential termination of his contract (the "Termination
Hearing"), Jackson contended that his use of racist terms in his
letters was metaphorical only.  He also averred that he wrote his
letters at times in his capacity as a teacher and at other times
in his capacity as a parent.  However, during his deposition in
March of 1999, Jackson stated that the Board members to whom the
abrasive comments were directed had called themselves those names
in Jackson's presence prior to his writing the letter(s) and that
he only repeated back what they themselves had already said.

In the fall of 1996, Jackson complained numerous times to
the new school superintendent, Dr. Connell, his direct
supervisor, Ms. Chastain, and the Board of Education about the
size of his classes.  He repeatedly asserted that the number of
students in his classroom was dangerous considering the various

---

of some of these letters were sometimes sent to all Board
members, the NAACP, the U.S. Justice Department, and the U.S.
Court of Appeals for the Eleventh Circuit.  Jackson also accused
Dr. Connell of "lying" because, he alleged, she told him that he
would be on a Board meeting agenda, but he was not.

3

second and third degree burns to his arm.[8]  The student was not
wearing protective gloves.

Dr. Connell met with Jackson two days after the burn
incident on September 13, 1996 to discuss the accident as well as
Jackson's concerns regarding his planning period and class size.
According to Dr. Connell's deposition testimony taken in July
1999, Jackson informed Dr. Connell that he did not require his
students to wear protective gloves while welding because it
decreases their dexterity and ability to adjust the welding
instruments.  At Dr. Connell's request, he stated that he would
require students to wear gloves at all times in the future.  At
the Termination Hearing, Jackson stated that students should
begin to learn how to weld with their gloves off because they
need dexterity to adjust the equipment knobs.  He also stated
that the injured student would have been burned regardless of
what protective equipment he could have been wearing.  However,
at Jackson's deposition in March 1999, Jackson stated that he
never instructed the students to not wear gloves, but that the
school required the students to pay for the gloves prior to their
use.  He stated that this was an oral policy, and that he had a

---

[8] This was a special education student.

5

abilities of his students,[4] the room's ventilation capacity,[5] and the relative safety of the equipment available for use.  In his deposition testimony, Jackson stated that the number of students in his classrooms had increased with Dr. Connell's arrival,[6] and that his number of classes increased from two to three per day.[7]

On September 11, 1996, after Jackson had informed Dr. Connell in writing of his belief that his classes were overcrowded, but prior to their meeting in person to discuss the matter, a welding student in one of Jackson's classes suffered

---

[4] Jackson averaged approximately two special education students per class whom he asserted needed additional attention, training, and supervision.

[5] Jackson alleged that the increased number of students corresponded to an increased amount of smoke which the ventilation system was no longer capable of effectively drawing out of the classroom.

[6] Dr. Peggy Connell commenced in her position as Superintendent on June 16, 1996, replacing Dr. Lance Grissett who served as Superintendent from 1976 through 1996.

[7] During the '90-'91 school year, Jackson had 12 students in his first period, and 18 students in his second period.  During the '92-'93 school year, Jackson had 14 students in each period. During the '93-'94 school year, Jackson had 13 students in his first period, and 14 students in his second period.  During the '94-'95 school year, Jackson had 10 students in his first period, and 15 students in his second period.  During the '95-'96 school year, Jackson had 10 students in his first period, and 17 students in his second period.  During the '96-'97 school year (after Dr. Connell's arrival), Jackson had 18 students in his first period, 13 students in his second period, and 22 students in his third period.

4

receipt book in his desk at school. No such book surfaced during
discovery.

According to Dr. Connell's notes from her meeting with
Jackson on September 13, 1996, and her deposition in March 1999,
Jackson voiced a concern that there were not enough gloves in his
classroom. She also stated in her deposition that the school
bought 60 pairs of gloves for Jackson on August 23, 1996.
According to Jackson's deposition testimony taken in March 1999,
he himself stated that he had 60 pairs of gloves in the
classroom.[9]

After the meeting between Dr. Connell and Jackson, Dr.
Connell requested John Offord, Coordinator for Secondary
Education, to observe Jackson's classroom; Fred Jenkins,
Transportation Supervisor and person in charge of safety issues
for the school system, to inspect Jackson's department; and John
Ragland, Coordinator for Special Education, to investigate

---

[9] However, there may be some confusion regarding what type
gloves people are talking about. Jackson stated in his
deposition that smaller deer-skin gloves should be used to
operate the torch, but that what he had were 60 pairs of long
leather gloves which can't be used in a torch setting. Jackson
also stated in a different part of his deposition that he
instructed his students to take off the heavy leather gloves to
adjust a torch and then to put the glove back on because they did
not have the smaller deerskin garment gloves which allegedly can
be worn when adjusting a torch.

Jackson's concerns regarding his class sizes. According to Offord's written report, Offord observed students in Jackson's first and third periods operating welding torches without wearing gloves. According to Jenkins report, the welding department had adequate safety equipment, including "leather gauntlet type gloves," and that no "gross" breach of safety standards regarding equipment and tools existed. It was determined that Jackson's average class size of 18 students was within state guidelines for vocational programs.

Also, soon after the burn incident, Jackson met with Ms. Chastain, his immediate supervisor, to discuss his concerns about safety in his classroom and over-enrollment. Jackson testified in his deposition that Chastain instructed him to make copies of the IEPs for certain students and take them to his meeting with Dr. Connell.[10] When Jackson met with Dr. Connell on September 13, he left a copy of the IEPs with her and requested permission to carry the records to an upcoming Board meeting to have proof of the overcrowding of his classes. Dr. Connell allegedly gave

---

[10] IEPs are highly confidential special education student program notes.

7

Jackson permission to take the records to the meeting.[11]
According to Jackson's deposition testimony, the IEPs had already
been passed out at the meeting prior to his arrival. However,
Dr. Connell stated in her deposition that she did not pass out
the IEPs prior to the meeting.

In a memorandum from John Ragland to Dr. Connell written on
October 18, 1996, one day after the above mentioned Board
meeting, Mr. Ragland stated that Mr. Gaines, the attorney for the
county, told him that "[t]his might be what we have been waiting
on to move toward taking action on Mr. Jackson," referring to
Jackson's dissemination of the IEPs.

Dr. Connell decided to take disciplinary action against
Jackson based on the injury to the student, Jackson's admission
that he did not require students to wear gloves when welding,
coupled with Jackson's subsequent failure to require students to
wear gloves while welding. Under Alabama Code Section 16-24-8,
Dr. Connell recommended the cancellation of Jackson's teaching
contract on the following grounds: 1) insubordination; 2) neglect
of duty; 3) incompetence; and 4) other good and just cause.

---

[11] There seems to be some confusion as to whether the "IEPs"
handed out at the Board meeting were actually IEPs or some other
type of document.

The alleged facts generally leading to these charges have already been discussed in large part, but are summarized as follows:  history of writing critical letters to various persons within the Talladega school system; continuing to improperly allow students to operate welding equipment without wearing gloves after Dr. Connell's specific instruction that he do so; the discovery of Jackson and/or his students asleep in the classroom on two occasions;  complaining about having to supervise students in the lunch room during the lunch hour; failure to properly complete required paperwork; purchasing supplies without the requisite approval; illegally and improperly distributing IEPs to Board members at a public Board meeting containing the names of Jackson's special education students; department budget "in the red;" and spending too much time on his office phone and running errands.

On October 25, 1996, Dr. Connell recommended the cancellation of Jackson's employment contract.  The Board approved this recommendation and written notice was provided to Jackson.   On the same date, upon the recommendation of Dr. Connell, the Board voted that Jackson be suspended with pay pending the hearing of the proposed cancellation of this employment contract.  Jackson requested an open hearing which was

9

held on November 19 and 21, 1996, i.e. the Termination Hearing.

Following the Termination Hearing, which involved sworn testimony

from multiple witnesses, and upon the recommendation of the

Superintendent, the Board voted to terminate Jackson's employment

contract on the four previously discussed grounds.  Jackson was

represented by counsel at the hearing and testified under oath.

Jackson appealed the discharge decision of the Board to the

Alabama State Tenure Commission ("the Tenure Commission").  A

hearing was held in Montgomery, Alabama before the Tenure

Commission on February 20, 1997 to hear Jackson's appeal.  After

oral argument from attorneys for both sides, the Tenure

Commission affirmed the cancellation of Jackson's employment

contract by unanimous vote, finding that Jackson's discharge was

not motivated by personal or political reasons which are

prohibited reasons under Alabama Code Section 16-24-8.

## II.  ANALYSIS

### A.  The Summary Judgment Standard

Summary judgment may be granted based upon facts developed

during the administrative proceedings, the pleadings, and

supplemental affidavits if together, they show that there is no

genuine issue as to any material fact.  <u>Celotex Corp. v. Catrett</u>,

477 U.S. 317, 322-323 (1986).  A dispute is genuine "if the

10

evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. <u>Id.</u> The non-moving party then bears the burden of showing that there are specific facts demonstrating that there is a genuine issue of fact for trial. <u>Id.</u> at 324. The trial court must consider all reasonable doubts in favor of the non-moving party, but need not resolve all doubts in a similar fashion. <u>Barnes v. Southwest Forest Indus., Inc.</u>, 814 F.2d 607, 609 (11th Cir. 1987).

### B.   Jackson's Title VII and § 1981 Claims[12]

#### 1.   Direct Evidence

Plaintiff argues that there is direct evidence of discriminatory animus. <u>See</u> <u>Trotter v. Board of Trustees of Univ. of Alabama</u>, 91 F.3d 1449, 1453 (11th Cir. 1996). Plaintiff contends that he has shown direct evidence of discriminatory

---

[12] The allocations of burdens and elements of a prima facie case are the same for employment claims stemming from Title VII and Section 1981. <u>Standard v. A.B.E.L. Services, Inc.</u>, 161 F.3d 1318, 1330 (11th Cir. 1998); <u>Bell v. Eufala City Bd. of Educ.</u>, 995 F. Supp. 1377, 1384 (M.D. Ala. 1998) (citations omitted). Accordingly, Plaintiff's claims under Title VII and Section 1981 will be considered together.

intent through his deposition testimony that Ms. Chastain, who was in contact with Dr. Connell regarding plaintiff's alleged performance problems, used racial slurs in the past.[13] Additionally, Plaintiff testified in his deposition that Mr. McLain who is a decision maker on the Board, told racially derogatory jokes and used derogatory terms to refer to African-Americans.[14]  Plaintiff argues that, as discussed below, defendants are unable to establish that the same employment decision would have been made absent discriminatory intent.   In the alternative, plaintiff argues Ms. Chastain's and Mr. McLain's comments show racial animus, relevant to showing pretext under the McDonnell Douglas framework outlined below.

Defendants argue that this is not a direct evidence case. Defendants contend that Jackson has never made any allegations of a direct evidence case until now - not to the EEOC and not in his Complaint.[15]  Additionally, defendants argue that there is no

---

[13] According to Jackson's deposition testimony, Ms. Chastain referred to black students as "nigger bitches" and "nigger wenches" in front of Jackson.   Jackson deposition at 95-98.

[14] According to Jackson's deposition testimony, Mr. McLain referred to Jackson as "dog face," "stupid," "ignorant," and told him to "stop writing them stupid letters; you make yourself and the black community look bad."   Jackson deposition at 165-167.

[15] This Court is not aware of any such requirement.

12

direct evidence as defined by the Eleventh Circuit.  See Wright

v. Southland Corp., 187 F.3d 1287 (11th Cir. 1999).  Rather,

there is only weak evidence of "inappropriate racial attitudes."

Id. at 1299; Jones v. Bessemer Carraway Med. Ctr., 151 F.3d 1321,

1323 (11th Cir. 1998).  The Court agrees that there is a complete

dearth of direct evidence to support this particular claim,

particularly as to decision makers.

### 2.  Circumstantial Evidence

#### a.  Standard

Under McDonnell Douglas, to prove discriminatory discharge

through circumstantial evidence: (1) the plaintiff must first

make out a prima facie case of discrimination; (2) the burden

then shifts to the defendant to produce a legitimate,

nondiscriminatory reason for the adverse employment action; and

(3) the burden then shifts back to the plaintiff to show that the

reasons offered by the defendant are pretextual for

discrimination.  McDonnell Douglas, 411 U.S. at 802-804.

Plaintiff and defendants disagree as to which prima facie

standard applies in a case such as this.  Plaintiff argues that

under the framework established by McDonnell Douglas, a plaintiff

establishes a prima facie case of termination based on racial

discrimination by showing: (1) he is a member of a protected

13

class; (2) he was qualified for the position held; (3) he was terminated; and (4) he was replaced by a person outside the protected class. <u>Coutu v. Martin County Bd. of County Commissioners</u>, 47 F.3d 1068, 1073 (11th Cir. 1995).

Defendants argue that for plaintiff to establish a prima facie case under <u>McDonnell Douglas</u>, he must show: (1) he belongs to a racial minority; (2) he was subjected to adverse job action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified to do the job. <u>McDonnell Douglas Cop. V. Green</u>, 411 U.S. 792, 802 (1973); <u>Jones v. Bessemer Carraway Med. Ctr.</u>, 137 F.3d 1306, 1310 (11th Cir. 1998); <u>Coutu</u>, 47 F.3d at 1073; <u>St. Mary's Honor Ctr. V. Hicks</u>, 509 U.S. 502, 506 (1993).

The weight of authority in termination cases is behind the standard urged by plaintiff. <u>See St. Mary's Honor Ctr.</u>, 509 U.S. at 506; <u>Coutu</u>, 47 F.3d at 1073; <u>Evans v. McClain of Georgia, Inc.</u>, 131 F.3d 957, 963 (11th Cir. 1997); <u>Eskra v. Provident Life and Accident Ins. Co.</u>, 125 F.3d 1406, 1411 (11th Cir. 1997). Thus, the standard put forth above by plaintiff will be used.

### b.  Jackson's Prima Facie Case

Under the standard set forth in <u>Hicks</u> and <u>Coutu</u>, plaintiff alleges he has established a prima facie case of discrimination.

14

First, Jackson is an African American.  Second, he was at least minimally qualified to teach welding at the Pittard School as evidenced by his education, his long teaching career, and his record of placing his students in jobs.  Third, Jackson's contract with the Talladega Board of Education was terminated on November 22, 1996.  Finally, plaintiff was replaced by a white man.

Defendants acknowledge that Jackson is a member of a protected class and that he suffered an adverse job action, i.e. the termination of his contract.  Under the standard argued by defendants, defendants argue that plaintiff cannot establish a prima facie case of race discrimination because plaintiff is unable to demonstrate that similarly situated employees were treated any differently than he.  However, a comparison against similarly situated employees is unnecessary under the relevant prima facie standard for termination cases.

Defendants also allege that plaintiff is not qualified for his former position.  Defendants allege that plaintiff's contract was canceled because of plaintiff's alleged insubordination, neglect of duty, incompetence, and other good and just cause as previously detailed.  Thus, plaintiff was not qualified for the job from which he was terminated.

The first, third, and fourth prongs of this standard are
undisputed.  Thus, for plaintiff to make out a prima facie case
of race discrimination based on his termination, he need only
show that he was qualified for his position.

For the purposes of employment discrimination cases, a
plaintiff need only prove that he or she is qualified according
to the job description given by the employer.  See Wright v.
Southland Corp., 187 F.3d 1287, 1301 n.16 (11th Cir. 1999) ("An
individual is 'qualified' for a position, for purposes of
employment discrimination law, if he meets the criteria that the
employer has specified for the position."); Underwood v.
Northport Health Services, Inc., __ F. Supp.2d __, 1999 WL 591853
at *7 (M.D. Ala. Aug. 2, 1999) (person presumptively qualified
for position if they have the requisite training and experience);
Reynolds v. Glynn County Bd. of Educ., 968 F. Supp. 696, 702
(S.D. Ga. 1996) (relevant degree plus forty years of experience
qualified plaintiff for position sought).  In this case, it is
clear that Jackson fulfills that minimal standard.  Jackson
received a Type 1 teaching certificate from Auburn University and
worked at Pittard for approximately twenty years, most of those
years with tenure and without incident in his classroom.  Thus,
Jackson has made out a prima facie case of race discrimination

16

based on his termination.

### c.  Defendants' Proffered Non-Discriminatory Reasons

Defendants argue that the Board canceled plaintiff's teaching contract based on legitimate, nondiscriminatory grounds as discussed above when discussing plaintiff's qualifications for teaching welding at Pittard.  Furthermore, defendants allege that the stated reasons for plaintiff's termination are not a pretext for unlawful discrimination.

The burden of whether defendants have proffered a legitimate nondiscriminatory reason for their decision to terminate Jackson "is 'exceedingly light'; the defendant must merely proffer non-[race] based reasons, not prove them."  Meeks v. Computer Assoc. International, 15 F.3d 1013, 1019 (11th Cir. 1994).  Defendants have offered numerous reasons for the termination of Jackson sufficient to pass this prong.  Thus, the burden shifts back to plaintiff to demonstrate that the defendants' proffered reasons are merely a pretext for racial discrimination.  Id.

### d.  Pretext

Plaintiff responds by alleging that defendants' proffered reasons are all pretextual for race discrimination.  Plaintiff alleges that he was never insubordinate.  Plaintiff alleges that every letter written to the Board was rooted in matters of public

17

concern, primarily racial discrimination within the school system. Plaintiff claims that although his letters may have offended his supervisors, they are protected by the First Amendment. See Pickering v. Board of Educ. Of Township High School Dist. 205, Will County Illinois, 391 U.S. 563, 573 (1968). Plaintiff alleges that he never refused to help with lunchroom duties, but only expressed his dissatisfaction with having to perform those duties. Plaintiff alleges that the forms passed out at the Board meeting may or may not have been IEPs, it is unclear who actually distributed the records, and none of the documents allegedly bore the names of the children to whom they refer. Rather, plaintiff argues, defendants were aware of plaintiff's unfamiliarity with proper procedure regarding special education students and used that to their advantage. Specifically, plaintiff argues that both Dr. Connell and Ms. Chastain were aware of plaintiff's intended use of the documents but never informed him of potential problems regarding their use. Furthermore, alleges plaintiff, Mr. Ragland's memo in which he stated Mr. Gaines comment that "this might be what we have been waiting on to move toward taking action against Mr. Jackson"

18

supports his argument of pretext.[16]

As to defendants' allegations regarding plaintiff's disregard for his department's budget, difficulties in filling out paper work, and escorting a newspaper reporter through the school without first obtaining permission, plaintiff contends that the evidence shows otherwise. First, the evidence allegedly indicates that plaintiff did not have the necessary control to overspend his budget even if he wanted to. Second, plaintiff does not recall ever being reprimanded or told that his behavior was inappropriate. Third, plaintiff's former supervisor testified during the Board Hearing that plaintiff was very prompt in turning in his paper work. Finally, plaintiff was unaware of the policy regarding newspaper reporters on campus and never made the same mistake again.

Plaintiff alleges that once he casts doubt on a fair number of the employer's articulated explanations, he diminishes the employers credibility and may not need to attack every reason. Combs v. Plantation Patterns, 106 F.3d 1519 (11th Cir. 1997). However, plaintiff argues that he can demonstrate that defendants' claims are meritless regardless. First, plaintiff

---

[16] Or, it could suggest that the defendants had been over cautious earlier.

19

alleges that the burn incident is not evidence of his neglect of duty.  Rather, he had complained to his supervisors prior to the accident of his safety concerns regarding his class sizes.  Plus, it is undisputed that the burned student would have received burns even if he had been wearing gloves.  Second, plaintiff alleges that he was not excessively absent from work, never exceeded his allowance of sick days per year, and spent time on the telephone in his attempts to find employment for his students.  Finally, plaintiff alleges that defendants had no good and just cause for terminating him, but that it was merely a pretext to quiet him.

Whether defendants' proffered reasons were a pretext to quiet him is not a concern for this particular claim.  What is now at issue here is whether defendants' proffered reasons were a pretext to discriminate against plaintiff on the basis of his race.  The only evidence put forth by plaintiff to prove this is his own testimony that at some time in the past some of his supervisors displayed inappropriate racial attitudes.  "The burden of persuasion [regarding pretext] remains with the plaintiff."  Meeks, 15 F.3d at 1021, quoting EEOC v. Reichhold Chem., Inc., 988 F.2d 1564, 1572 (11th Cir. 1993).  Based on this evidence, Jackson has not carried his burden.

20

**Court's Conclusions on Race Discrimination Claim:**

The Court starts with the assumption that plaintiff has presented sufficient evidence to establish a prima facie case. This is based upon a determination that (1) plaintiff is black, (2) he was at least minimally qualified for the job, (3) he was terminated from the job, and (4) the job was given to a white.

It is clear, however, that the defendants have articulated legitimate, non-discriminatory reasons for their actions. Plaintiff, thus, is required to demonstrate that the stated reasons were pretextual. Three recent Eleventh Circuit cases throw light on the standards the court must apply in evaluating plaintiff's evidence.

In <u>Bogle v. Orange County Bd. of Comm'rs</u>, 162 F.3d 653 (11th Cir. 1998), the court, <u>inter alia</u>, stated:

> Finally, we may affirm a judgment as a matter of law only if the facts and inferences "point so overwhelmingly in favor of the movant...that reasonable people could not arrive at a contrary verdict." <u>Id.</u> (Citations and internal quotation omitted).

> . . .

> Once Bogle introduced Orange County's legitimate nondiscriminatory reason for his discharge, the initial presumption of discrimination accompanying the prima facie case dissolved, and the <u>McDonnell Douglas</u> framework required Bogle to demonstrate that the stated reason was pretextual. <u>Combs</u>, 106 F.3d at 1528.

21

. . .

Accordingly, Orange County was not entitled to judgment
as a matter of law if Bogle produced any evidence that
would permit a reasonable jury to disbelieve the
proffered reasons for his discharge.  (Footnote
omitted).

. . .

See Fed.R.Civ.P. 50(a)(1); Celotex Corp. v. Catrett,
477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d
265 (1986) (noting that the standard for a directed
verdict and summary judgment are the same and that the
absence of evidence on an essential element of a
party's case will support judgment as a matter of law
against that party); Reeves v. City of Jackson, 532
F.2d 491, 494 (5th Cir. 1976) ("If, after a full
development of the facts the plaintiff's cause is too
weak to string the Constitution's bow or unsheathe the
sword provided for the redress of such grievances...it
may be washed out on summary judgment...or, if it gets
beyond that, by motion for directed verdict...at the
end of the plaintiff's case....").

In Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318 (11th

Cir. 1998), the court, inter alia, stated:

In order to establish a case under Title VII, a
plaintiff may use three different kinds of evidence of
discriminatory intent: direct evidence, circumstantial
evidence, or statistical evidence.  The analytical
framework and burden of production varies depending on
the method of proof chosen.

. . .

Once Standard established his prima facie case, Plaster
Concepts needed to rebut the presumption of
discrimination by advancing legitimate, non-
discriminatory reasons for Standard's discharge.  This
is a burden of production, not persuasion.  Plaster

22

Concepts need only produce evidence that could allow a
rational fact finder to conclude that Standard's
discharge was not made for a discriminatory reason.
<u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1528 (11th
Cir. 1997), <u>cert. denied</u>, __ U.S. __, 118 S.Ct. 685,
139 L.Ed.2d 632 (1998).

. . .

By presenting legitimate nondiscriminatory reasons for
Standard's termination, Plaster Concepts has rebutted
the presumption of discriminatory intent.  In light of
this, Standard must now create a genuine issue of
material fact as to whether the reasons advanced are
pretextual.  In other words, Standard must provide
sufficient evidence to allow a reasonable fact finder
to conclude that the proffered reasons were not
actually the motivation for his discharge.  <u>Combs</u>, 106
F.3d at 1538.  Standard may do this (1) by showing that
the legitimate non-discriminatory reasons should not be
believed; or (2) by showing that, in light of all of
the evidence, discriminatory reasons more likely
motivated the decision than the proffered reasons.
<u>Mayfield v. Patterson Pump Co.</u>, 101 F.3d 1371, 1376
(11th Cir. 1996) (<u>quoting</u> <u>Texas Dept. of Community</u>
<u>Affairs v. Burdine</u>, 450 U.S. 248, 256, 101 S.Ct. 1089,
1095, 67 L.Ed.2d 207 (1981)).

. . .

Such explanation of a general reasons is insufficient
to show pretext.  <u>Id.</u> at 1377 (holding that plaintiff
failed to show pretext when the employer's later
statement merely offered more detail regarding
perceived performance problems).

. . .

The district court found that his kind of minimal,
technical discrepancy is insufficient to show pretext,
and we agree.

. . .

23

The pretext inquiry is concerned with the employer's
perception of the employee's performance, not the
employee's own beliefs.  Holifield v. Reno, 115 F.3d
1555, 1565 (11th Cir. 1997) (holding that when employer
produces negative performance reviews, employee's
assertion of his own good performance is insufficient
to defeat summary judgment).

. . .

The heart of the pretext inquiry is not whether the
employee agrees with the reasons that the employer
gives for the discharge, but whether the employer
really was motivated by those reasons.

. . .

In order to directly attack Plaster Concepts' reasons,
Standard must demonstrate "such weaknesses,
implausibilities, inconsistencies, incoherencies, or
contradictions in the employer's proffered legitimate
reasons for its action that a reasonable fact finder
could find [all of those reasons] unworthy of
credence."  Combs, 106 F.3d at 1538.

. . .

"[A] plaintiff may not in all cases merely rest on the
laurels of her prima facie case in the face of powerful
justification evidence offered by the defendant."
Grisby v. Reynolds Metals Co., 821 F.2d 590, 596 (11th
Cir. 1987).

Both Bogle and Standard cite and rely upon Combs v.

Plantation Patterns, 106 F.3d 1519 (11th Cir. 1997), where the

trial court's judgment was reversed for failure to grant judgment

as a matter of law.  The court, inter alia, stated:

...According to the Supreme Court:

24

> [The plaintiff] now must have the opportunity
> to demonstrate that the proffered reason was
> not the true reason for the employment
> decision.... [The plaintiff] may succeed in
> this either directly by persuading the court
> that a discriminatory reason more likely
> motivated the employer or indirectly by
> showing that the employer's proffered
> explanation is unworthy of credence.

Id. at 256, 101 S.Ct. at 1095 (emphasis added)
(citation omitted).  In other words, the plaintiff has
the opportunity to come forward with evidence including
the previously produced evidence establishing the prima
facie case, sufficient to permit a reasonable
factfinder to conclude that the reasons given by the
employer were not the real reasons for the adverse
employment decision.  Id.; McDonnell Douglas, 411 U.S.
at 804, 93 S.Ct. at 1825.

Although the Supreme Court in Hicks rejected the
position that disbelief of the employer's proffered
reasons requires judgment for the plaintiff, the Court
was careful to explain that such disbelief, in tandem
with the plaintiff's prima facie case, is sufficient to
permit the factfinder to infer discrimination.  The
Court said:

> The factfinder's disbelief of the reasons put
> forward by the defendant (particularly if
> disbelief is accompanied by a suspicion of
> mendacity) may, together with the elements of
> the prima facie case, suffice to show
> intentional discrimination. Thus, rejection
> of the defendant's proffered reasons will
> permit the trier of fact to infer the
> ultimate fact of intentional discrimination,
> and the Court of Appeals was correct when it
> noted that, upon such rejection, "[n]o
> additional proof of discrimination is
> required."

Id. at 511, 113 S.Ct. at 2749 (quoting Hicks v. St.

25

Mary's Honor Ctr., 970 F.2d 487, 493 (8th Cir. 1992))
(footnote omitted) (second emphasis added). That is a
pretty clear statement.

. . .

Based on the Supreme Court's clear statement in the
majority opinion in Hicks, read together with the
rationale of the dissenting justices, we understand the
Hicks Court to have been unanimous that disbelief of
the defendant's proffered reasons, together with the
prima facie case, is sufficient circumstantial evidence
to support a finding of discrimination. Therefore, it
follows from Hicks that a plaintiff is entitled to
survive summary judgment, and judgment as a matter of
law, if there is sufficient evidence to demonstrate the
existence of a genuine issue of fact as to the truth of
each of the employer's proffered reasons for its
challenged action.

. . .

Thus Hairston, our first decision on this issue
following Hicks, clearly held that one way a plaintiff
may succeed in establishing discrimination is by
showing that the employer's proffered explanations are
not credible. When that happens, the plaintiff may or
may not ultimately prevail in the litigation, because
the factfinder may or may not choose to make the
permissible inference of discrimination. However, as we
explained in Hairston, once the plaintiff introduces
evidence sufficient to permit the factfinder to
disbelieve the employer's proffered explanations,
summary judgment is not appropriate, because "[i]ssues
of fact and sufficiency of evidence are properly
reserved for the jury." Id. at 921. We said nothing in
Hairston about the plaintiff being required to
establish anything more than a prima facie case plus
the falsity of the tendered explanations; we said
nothing about anything else being required for the
plaintiff to avoid summary judgment, because nothing
else is required.

. . .

26

Because the plaintiff in <u>Batey</u> had produced sufficient evidence for the factfinder to disbelieve the reasons that the employer proffered for the employment decision, we reversed the district court's grant of summary judgment for the employer. <u>Id.</u> at 1335-36. Consistent with our <u>Hairston</u> precedent, and with <u>Hicks</u>, we held that evidence of pretext, when added to a prima facie case, is sufficient to create a genuine issue of material fact that precludes summary judgment. <u>Id.</u>

. . .

In <u>Walker v. NationsBank of Florida</u>, 53 F.3d 1548 (11th Cir. 1995), a panel of this Court affirmed the grant of judgment as a matter of law in favor of the employer in an age and sex discrimination case, even though the plaintiff had established a prima facie case and had put on evidence sufficient to permit the factfinder to disbelieve all of the employer's proffered reasons for the adverse employment action. <u>Id.</u> at 1556-58. Despite that evidence, the <u>Walker</u> panel said that "Walker did not produce evidence that raised a suspicion of mendacity sufficient to permit us to find on this record that the bank intentionally discriminated against her on the basis of age and/or sex." <u>Id.</u> at 1558. For that reason, the panel concluded that "[r]easonable and fair-minded persons, in the exercise of impartial judgment, would not conclude that the bank had discriminated against [the plaintiff] on the basis of her age or sex." <u>Id.</u>

In a concurring opinion, Judge Johnson accurately noted that the majority had exceeded its proper role by "deciding whether evidence of pretext supports an inference of intentional discrimination," a task that requires credibility determinations and the weighing of evidence--which is the jury's function. <u>Id.</u> at 1563 (Johnson, J., concurring). As Judge Johnson pointed out, 53 F.3d at 1561-62, the majority's reasoning was not consistent with the teaching of <u>Hicks</u>, or with our decisions in <u>Howard</u> and <u>Batey</u>. Judge Johnson agreed with the result in <u>Walker</u> only because, in his view, the evidence was not sufficient to permit a factfinder

27

to reject the employer's proffered reasons for its
action. Id. at 1564-65.

As we have recognized before, "no one is perfect, least
of all federal appellate judges, and from our mistakes
and oversights spring inconsistent decisions which we
must deal with as best we can." United States v. Hogan,
986 F.2d 1364, 1369 (11th Cir. 1993). The Walker
decision is a mistake. Not only is Walker inconsistent
with the Supreme Court's clear instruction in Hicks,
but it is also inconsistent with the holdings of our
Hairston, Batey, Howard, and Cooper-Houston decisions.
Where there are inconsistent panel decisions, "the
earliest panel opinion resolving the issue in question
binds this circuit until the court resolves the issue
en banc." United States v. Dailey, 24 F.3d 1323, 1327
(11th Cir. 1994) (quoting Clark v. Housing Auth. of
Alma, 971 F.2d 723, 726 n.4 (11th Cir. 1992)). Our next
decision on the issue at hand is consistent with that
principle, because it followed the law established in
the earlier decisions instead of the Walker decision.

. . .

To summarize, with the exception of Walker, which is an
anomaly, this circuit's post-Hicks decisions uniformly
hold that once a plaintiff has established a prima
facie case and has put on sufficient evidence to allow
a factfinder to disbelieve an employer's proffered
explanation for its actions, that alone is enough to
preclude entry of judgment as a matter of law.

In discussing a hypothetical posed in a somewhat discredited

Isenbergh opinion, the court stated:

...The issue upon which judgment as a matter of law
turns is whether the employer's proffered
nondiscriminatory reason for its action, excessive
lateness, may reasonably be disbelieved, not whether
the employee was late nine times as opposed to seven.

. . .

28

In the hypothetical set up in the <u>Isenbergh</u> opinion,
there is no evidence to discredit the employer's
explanation that the defendant was fired for excessive
lateness; the defendant's reason for its action remains
unrebutted. So, the employer would be entitled to
judgment as a matter of law under <u>Hicks</u>, 509 U.S. at
515-18, 113 S.Ct. at 2751-53 (discussing plaintiff's
burden of discrediting the defendant's explanations),
and under all of our prior decisions, including
<u>Hairston</u>, <u>Batey</u>, and <u>Howard</u>.

. . .

When deciding a motion by the defendant for judgment as
a matter of law in a discrimination case in which the
defendant has proffered nondiscriminatory reasons for
its actions, the district court's task is a highly
focused one. The district court must, in view of all
the evidence, determine whether the plaintiff has cast
sufficient doubt on the defendant's proffered
nondiscriminatory reasons to permit a reasonable
factfinder to conclude that the employer's proffered
"legitimate reasons were not what actually motivated
its conduct," <u>Cooper-Houston v. Southern Ry. Co.</u>, 37
F.3d 603, 605 (11th Cir. 1994) (citation omitted). The
district court must evaluate whether the plaintiff has
demonstrated "such weaknesses, implausibilities,
inconsistencies, incoherencies, or contradictions in
the employer's proffered legitimate reasons for its
action that a reasonable factfinder could find them
unworthy of credence." <u>Sheridan</u>, 100 F.3d at 1072
(citation and internal quotation marks omitted); <u>see
also</u> <u>Walker</u>, 53 F.3d at 1564 (Johnson, J., concurring)
(discussing methods of proving pretext). However, once
the district court determines that a reasonable jury
could conclude that the employer's proffered reasons
were not the real reason for its decision, the court
may not preempt the jury's role of determining whether
to draw an inference of intentional discrimination from
the plaintiff's prima facie case taken together with
rejection of the employer's explanations for its
action. At that point, judgment as a matter of law is
unavailable.

29

. . .

> ...We must, in view of all the evidence, determine
> whether the plaintiff has cast sufficient doubt on the
> defendant's proffered nondiscriminatory reasons to
> permit a reasonable factfinder to conclude that the
> employer's proffered "legitimate reasons were not what
> actually motivated its conduct," <u>Cooper- Houston v.
> Southern Ry. Co.</u>, 37 F.3d 603, 605 (11th Cir. 1994).

In <u>Combs</u>, the employer gave three reasons as to why it had
promoted Walker instead of Combs.  The appellate court determined
that the plaintiff had submitted sufficient evidence to allow a
reasonable juror to conclude that two of the articulated reasons
did not actually motivate the employer's decision.  The court
held, however, that the district court had erred in not granting
judgment as a matter of law because,

> In relying on Walker's financial improprieties to
> undermine Meadowcraft's explanation that it based its
> promotion decision on Walker's superior supervisory
> experience, Combs confuses disagreement about the
> wisdom of an employer's reason with disbelief about the
> existence of that reason and its application in the
> circumstances. Reasonable people may disagree about
> whether persons involved in past financial
> improprieties should be made supervisors, but such
> potential disagreement does not, without more, create a
> basis to disbelieve an employer's explanation that it
> in fact based its decision on prior non-financial
> supervisory experience. Meadowcraft's decision to
> promote Walker instead of Combs may seem to some to be
> bad business judgment, and to others to be good
> business judgment, but federal courts do not sit to
> second-guess the business judgment of employers. Stated
> somewhat differently, a plaintiff may not establish
> that an employer's proffered reason is pretextual

> merely by questioning the wisdom of the employer's
> reason, at least not where, as here, the reason is one
> that might motivate a reasonable employer.

The court added,

> ...Combs failed to produce evidence sufficient to
> permit a reasonable factfinder to disbelieve
> Meadowcraft's proffered nondiscriminatory explanation
> that it promoted Walker instead of Combs because Walker
> had superior supervisory experience. Because of that
> failure, the district court should not have permitted
> the case to go to the jury. Meadowcraft was entitled
> to judgment as a matter of law.

Combs indicates that a plaintiff cannot prevail merely because he

or she casts doubt on one or more of a defendant's suggested

reason(s) if the evidence does not raise a substantial issue

about the credibility of the other reason(s).

The Court is well aware that some courts have indicated that

summary judgment and judgment as a matter of law are particularly

inappropriate in employment discrimination cases.  This must be

somewhat a repetition of anachronistic holdings.  A myriad of

Eleventh Circuit Court and other circuit court cases have either

upheld the grants of such motions or have reversed trial courts

for failing to grant such motions.  In Grigsby v. Reynolds Metals

Co., 821 F.2d 590, 595 (11th Cir. 1987), the court stated:

> We also recognize, however, that the inference of
> intentional discrimination raised by a plaintiff's
> prima facie case may be stronger or weaker, depending
> upon the facts of the particular case....  "To a large

31

extent, of course, the strength or weakness of the
inference of discrimination created by the employee's
prima facie case defines the nature of the employer's
rebuttal." ... In some cases, the defendant's
evidence of a legitimate, non-discriminatory reason for
its actions may be so strong as to rebut completely the
inference raised by the plaintiff's prima facie case.
Such is the case here. Of course, even in the face of
such strong justification evidence, a plaintiff might
still create an issue of fact and avoid summary
judgment by introducing additional evidence of pretext.
But a plaintiff may not in all cases merely rest on the
laurels of her prima facie case in the face of powerful
justification evidence offered by the defendant.
Without more, the evidence constituting Grigsby's prima
facie case is not sufficient to create an issue of fact
in light of the compelling evidence of lawful motive
presented by Reynolds.

Id. at 595-96.  Based on the foregoing, the court judges its task

to determine the following:

(1) Has plaintiff offered evidence of a prima facie case?

(2) If he has, how strong is it?

(3) Has defendant offered rebuttal evidence?

(4) If so, how strong is it?  Is it strong enough to

overcome a weaker prima facie case?

(5) If defendant's rebuttal is strong enough to overcome a

weaker prima facie case, has plaintiff offered sufficient

evidence of pretext to create an issue of fact?

In Grigsby, supra, the court said,

Grigsby also asserts that the district court erred in

32

completely accepting Reynolds' justification that it
did not select her for the District Traffic Manager
position because it found someone else who was
objectively more qualified. Her entire evidence on this
point consisted of her affidavit and several
accompanying exhibits. Grigsby showed that her salary
performance appraisal for the period preceding her
application exceeded that of Regan Ragland, the
candidate who was eventually chosen for the position.
Grigsby also asserted that the supposedly objective
standards for the position were created after Ragland
was selected for the job. Further, Grigsby stated in
her affidavit that she was told by Jim Ogborne,
Reynolds' Customer Service Manager, that "the
characters the Traffic Manger would have to deal with
were pretty rough and he did not want me to have to
deal with this type of thing." Grigsby Aff. at 2.
However, in light of Reynolds' extensive evidence of
the relative qualifications of the applicants,
Grigsby's testimony and exhibits simply fail to raise
any inference of pretext or discriminatory intent.

It is undisputed that Ragland had far greater
experience with Reynolds' cost accounting system,
capitalization projects, auditing procedures, and
computer systems than did Grigsby. Ragland also had
eight years experience in various departments of the
Alloys plant, including four years experience
supervising professional engineers, as opposed to
Grigsby whose experience was largely limited to the
smaller WRB plant. Moreover, the fact that Grigsby
received superior performance ratings in her WRB
position does not refute the fact that Ragland was
better qualified for the more sophisticated job
Reynolds sought to fill in the Alloys plant.

Id. at 596.

This is not a situation where, as Grigsby contends, the
district court impermissibly weighed the parties'
evidence instead of merely looking for the existence of
a genuine issue of fact. Where the defendant's
justification evidence completely overcomes any

33

inference to be drawn from the evidence submitted by the plaintiff, the district court may properly acknowledge that fact and award summary judgment to the employer. Grigsby's conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where Reynolds has offered such extensive evidence of legitimate, nondiscriminatory reasons for its actions. See Meiri v. Dacon, 759 F.2d at 998 (conclusory allegations of discrimination insufficient to raise inference of pretext and thereby defeat summary judgment motion). Under these circumstances, Reynolds was entitled to summary judgment.

Id. at 597.

In Branson v. Price River Coal Co., 853 F.2d 768, 771-72

(10th Cir. 1988), the court stated:

However, we also hold the district court was justified in entering summary judgment on the grounds that plaintiffs failed to present any credible evidence on the issue of pretext. To avoid summary judgment, a party must produce "specific facts showing that there remains a genuine issue for trial" and evidence " 'significantly probative' as to any [material] fact claimed to be disputed." Steckl v. Motorola, Inc., 703 F.2d 392, 393 (9th Cir. 1983) (quoting Ruffin v. County of Los Angeles, 607 F.2d 1276, 1280 (9th Cir. 1979), cert. denied, 445 U.S. 951, 100 S.Ct. 1600, 63 L.Ed.2d 786 (1980)). Thus, plaintiffs' mere conjecture that their employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment.

Mrs. Branson presented no evidence showing that the decision to eliminate her job was motivated by age discrimination and admits she would have required at least minimal training to assume any of the positions retained by younger employees. Her assertion that Price River should nonetheless have retained her is

34

insufficient to create a genuine issue of fact
regarding Price River's articulated reasons for her
discharge and avoid summary judgment. The ADEA does not
require employers to accord members of the protected
class preferential treatment, but only that they treat
age neutrally. See Williams, 656 F.2d at 129-30.

Mrs. Saccomanno also failed to create a genuine issue
of fact regarding Price River's articulated reasons for
her discharge. She admits Mr. Anderson "felt" she was
less qualified than Mr. Hanson for the accounting
department's remaining position and claims only that
she was in fact equally or more qualified than Mr.
Hanson. As courts are not free to second-guess an
employer's business judgment, this assertion is
insufficient to support a finding of pretext. See
Kephart v. Institute of Gas Technology, 630 F.2d 1217,
1223 (7th Cir. 1980), cert. denied, 450 U.S. 959, 101
S.Ct. 1418, 67 L.Ed.2d 383 (1981). It is the perception
of the decision maker which is relevant, not
plaintiff's perception of herself. Smith v. Flax, 618
F.2d 1062, 1067 (4th Cir. 1980). Consequently, the
district court's order of summary judgment was
appropriate.

In Hudson v. Southern Ductile Casting Corp., 849 F.2d 1372,

1376 (11th Cir. 1988), the court stated:

Although summary judgment should be granted with
caution in employment discrimination cases, there are
occasions when such disposition is appropriate. See,
e.g., Beard v. Annis, 730 F.2d 741 (11th Cir. 1984).
This is one of those cases. Where, as here, full
discovery has been conducted, the Supreme Court stated
recently that "there is no issue for trial unless there
is sufficient evidence favoring the nonmoving party for
a jury to return a verdict for that party. If the
evidence is merely colorable or is not significantly
probative, summary judgment may be granted." Anderson
v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S.Ct.
2505, 2511, 91 L.Ed.2d 202, 212 (1986) (citations
omitted). See also Celotex Corp. v. Catrett, 477 U.S.

317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). We agree
with the district court that the evidence in this case
was such as to warrant summary judgment.

In <u>Pace v. Southern Ry. Sys.</u>, 701 F.2d 1383, 1391 (11th Cir.

1983), the court stated:

Where the ADEA plaintiff has shown "no evidence 'which
might infer that age was even a factor in the
decision'" of which plaintiff complains summary
judgment is warranted. <u>Simmons v. McGuffey Nursing
Home, Inc.</u>, 619 F.2d at 370. A plaintiff, when faced
with a motion for summary judgment, cannot rely on
attenuated possibilities that a jury would infer a
discriminatory motive, but rather must come forward
with sufficient evidence to establish a prima facie
case and respond sufficiently to any rebuttal by the
defendant to create a genuine issue of material fact.
Even where a prima facie case has been established but
the defendant has rebutted with a proffer of
legitimate, nondiscriminatory reasons for the
discharge, a genuine issue of material fact is not
automatically presented. As the Supreme Court noted in
<u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S.
at 254 n.7, 101 S.Ct. at 1094 n.7, once established a
prima facie case creates a rebuttable presumption of
discrimination; but this presumption alone does not
create an inference that a material fact, sufficient to
present a jury question, is in issue. <u>See also</u> <u>Reeves
v. General Food Corp.</u>, 682 F.2d 515, 521-22 & n.9 (5th
Cir. 1982). <u>Cf.</u> <u>Moore v. Sears, Roebuck & Co.</u>, 464
F.Supp. at 366 ("Only in an extraordinary instance
could rebuttal evidence be so conclusive as to permit
summary adjudication). In <u>Simmons</u>, <u>supra</u>, defendants
rebutted plaintiff's prima facie case by showing a
legitimate, nondiscriminatory reason for the discharge
and plaintiff failed to prove that age, rather than the
nondiscriminatory reason, was the motivation for the
decision. 619 F.2d at 371. This court held that summary
judgment was appropriate because "[t]he possibility of
a jury drawing a contrary inference sufficient to
create a dispute as to a material fact does not reify

36

to the point even of a thin vapor capable of being seen
or realized by a reasonable jury." Id.

In a recent Supreme Court case, the Court made it apparent
that neither the presence of mechanical proof nor the absence of
mechanical proof is conclusive.  In O'Connor v. Consolidated Coin
Caterers Corp., 517 U.S. 308, 116 S.Ct. 1307 (1996), the Court
stated, inter alia,

> In our view, however, the proper solution to the
> problem lies not in making an utterly irrelevant factor
> an element of the prima facie case, but rather in
> recognizing that the prima facie case requires
> "evidence adequate to create an inference that an
> employment decision was based on a[n] [illegal]
> discriminatory criterion."

The issue is not fairness, nor bad judgment, nor mistake.
It is discrimination, vel non.  See Nix v. WLCY Radio/Rahall
Comm., 738 F.2d 1181 (11th Cir. 1984) where the court stated,
inter alia,

> The "ultimate question" in a disparate treatment case
> is not whether the plaintiff established a prima facie
> case or demonstrated pretext, but "whether the
> defendant intentionally discriminated against the
> plaintiff". United States Postal Service Board of
> Governors v. Aikens, 1983, 460 U.S. 711, ----, 103
> S.Ct. 1478, 1481-82, 75 L.Ed.2d 403, 409-10; see also
> Lehman v. Trout, 1984, 465 U.S. 1056, 104 S.Ct. 1404,
> 79 L.Ed.2d 732.
>
> . . .
>
> But Title VII does not take away an employer's right to
> interpret its rules as it chooses, and to make

37

determinations as it sees fit under those rules. "Title VII addresses discrimination." <u>Ferguson v. Veterans Administration</u>, 11 Cir. 1984, 723 F.2d 871, 872. "Title VII is not a shield against harsh treatment at the workplace." <u>Jackson v. City of Kileen</u>, 5 Cir. 1981, 654 F.2d 1181, 1186. Nor does the statute require the employer to have good cause for its decisions. The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason. <u>Megill v. Board of Regents</u>, 5 Cir. 1976, 541 F.2d 1073, 1077; <u>Sullivan v. Boorstin</u>, 1980, D.D.C., 484 F.Supp. 836, 842. "While an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was a pretext for illegal discrimination. The employer's stated legitimate reason ... does not have to be a reason that the judge or jurors would act on or approve." <u>Loeb v. Textron, Inc.</u>, 1 Cir. 1979, 600 F.2d 1003, 1012 n. 6. Although WLCY's decision to fire Nix, and its refusal to reconsider that decision, might seem unfair or even "incredible" to outside observers, Nix cannot prevail in his Title VII action for he has not established discriminatory intent.[17]

The Court concludes that the defendants have articulated several bona fide strong reasons for their action. Plaintiff has offered only a weak rebuttal. There is no reasonable inference that defendants were motivated by plaintiff's race. The defendants' motion will be granted as to the plaintiff's Title VII and section 1981 claims and as to the section 1983 claims

---

[17] If all arguably unfair decisions are considered to be incredible and a pretext for intentional discrimination, the principle established in <u>Nix</u> would be emasculated. Here, there is no question that, fair or unfair, the evidence developed after investigation, not plaintiff's race, led to his termination.

insofar as they are based upon alleged race discrimination.

### C.  Jackson's Retaliation Claim

#### 1.  Standard

In order to survive summary judgment on claims of retaliation whether they be premised on § 1981 or Title VII, a plaintiff must establish a prima facie case and demonstrate that the employer's proffered legitimate reason, if any, is pretext. Coutu, 47 F.3d at 1074. "To recover for retaliation, the plaintiff 'need not prove the underlying claim of discrimination which led to [his] protest,' so long as [he] had a reasonable good faith belief that the discrimination existed." Meeks v. Computer Assoc. Int'l, 15 F.3d 1013, 1021 (11th Cir. 1994).  To make out a prima facie case of retaliation, a plaintiff must prove: (1) that he engaged in a statutorily protected activity; (2) that an adverse employment action occurred; and (3) that the adverse action was causally related to the plaintiff's protected activities.  Id.; Coutu, 47 F.3d at 1074.

#### a.  Jackson's Prima Facie Case

Plaintiff alleges that he has established a prima facie case of retaliation because he engaged in a protected activity, an adverse employment action occurred, and the adverse action was arguably causally related to his activities.  As discussed below,

39

plaintiff's speech activities are protected. All parties agree that plaintiff suffered an adverse employment action.

The issue then becomes whether plaintiff's termination was causally related to his protected activities. "[W]e interpret 'the causal link requirement broadly; a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'" Meeks, 15 F.3d at 1021, quoting Tipton v. Canadian Imperial Bank of Commerce, 872 F.2d 1491 (11th Cir. 1989). Held to this standard it is clear that Plaintiff's outspokenness is arguably causally related to his termination as the subject was discussed extensively at the Termination Hearing as well as in Defendants' briefs as a reason for termination. Thus, plaintiff has made out a prima facie case of retaliation under Title VII and § 1981.

### b. Defendants' Legitimate Reason

As discussed above, defendants argue that they terminated plaintiff based on legitimate criteria. Also as discussed above, this burden is light and defendants have met it.

### c. Pretext

As discussed above, plaintiff contends that defendants' explanations are pretext for retaliation for his outspokenness and criticisms of the Board. Also as stated above, the burden of

40

persuasion on this point is on the plaintiff.   Meeks, 15 F.3d at
1021.   Based on all the evidence considered together, it seems
that Dr. Connell recommended Jackson's discharge for proper
reasons, i.e. a student was seriously injured in his classroom
and under his care, that student was not required to wear gloves,
and after the incident and after Dr. Connell's specific direction
that students wear gloves, Jackson continued to not require
students to wear gloves while welding.   While the Board's reasons
for discharging plaintiff may somewhat differ from those of Dr.
Connell, the rationale of Combs and other cases cited above have
a bearing.   The Board could not have acted without a
recommendation of Dr. Connell.   It is obvious that one or more of
her reasons were non-discriminatory.   It also appears that the
manner of plaintiff's complaints were unreasonable if not racist.
A plaintiff cannot simply create a retaliation claim by being
insubordinate.

### C.   Jackson's First Amendment Claim

### 1.   Standard

When analyzing First Amendment retaliation claims, courts
must weigh the following factors: (1) whether the employee's
speech involves a matter of public concern; (2) whether the
employee's interest in speaking outweighs the government's

legitimate interest in efficient public service; (3) whether the speech played a substantial part in the government's challenged employment decision; and (4) whether the government would have made the same employment decision in absence of the protected conduct. Walker v. Schwalbe, 112 F.3d 1127, 1131 (11th Cir. 1997); Beckwith v. City of Daytona Beach Shores, 58 F.3d 1554, 1563-64 (11th Cir. 1995). The first two factors are questions of law for the court to decide, and the third and fourth factors are questions of fact. Beckwith, 58 F.3d at 1564.

### a. Matters of Public Concern

Plaintiff contends that racism is a matter of grave public concern and that there is no evidence that any of the statements in plaintiff's letters were untrue. Defendants allege that the subject matter of the letters was not racism but personal attacks on Jackson's supervisors.

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form and context of given statement, as revealed by the whole record." Connick v. Myers, 461 U.S. 138, 147 (1983). Furthermore, employees may not be dismissed for comments on matters of public concern that are substantially correct. Pickering v. Board of Education, 391 U.S. 563, 570 (1968). Racial discrimination is "a matter inherently

42

of public concern." Connick, 461 U.S. at 148, n.8. Looking at
the letters sent by Jackson to his superiors in their totality,
it is clear that they largely address Jackson's concerns with
racism in the school district. Thus, Jackson's speech does
address a matter of public concern, despite its offensiveness to
some. See, e.g., Mozzochi v. Borden, 959 F.2d 1174, 1178 (2d
Cir. 1992) (critical and crude letters sent to Town Manager and
other town officials protected by the First Amendment); Ustrak v.
Fairman, 781 F.2d 573, 577-78, 580 (7th Cir. 1986) (jury rational
in determining that prisoner's letter writing campaign directed
at warden complaining of racial discrimination real reason for
warden's treatment of prisoner).

### b.  Employee's Interests v. Government's Interests

Plaintiff argues that he had a significant interest as he
was a teacher, parent, and community activist within the district
with a strong concern for the African-American community.
Defendants contend that plaintiff's letters led to disharmony and
dissension within the school system as evidenced by Dr.
Grisset's, Mr. McMurphy's, and Ms. Chastain's testimony at the
Termination Hearing.

It is clear that Jackson did have a significant interest in

43

attempting to eradicate racism from the Talladega school system[18] as he both taught in the system and had children attending school in the system.   The question then becomes whether the defendants' interest in efficient public service outweighs Jackson's interest in free speech.   Persons whose speech unreasonably disrupts the efficient operation of the government may be acted against. Tindal v. Montgomery County Commission, 32 F.3d 1535, 1540 (11th Cir. 1994).   Speech which merits no First Amendment protection must so severely impede the effectiveness of both the speaker and the recipient that the governmental interest at stake clearly outweighs the speech interest.   Id., quoting Morales v. Stierheim, 848 F.2d 1145, 1151 (11th Cir. 1988), cert. denied, 489 U.S. 1013 (1989).   In this case, defendants' claim that Jackson's performance as an instructor went down around the times of his letter writing and that Jackson created disharmony at Pittard.   However, nowhere in the voluminous documents submitted to the court is there evidence that Jackson's actions actually led to ineffectiveness.   It is certainly clear that people felt annoyed, insulted, and bothered by the letters and considered them unprofessional, but there is no evidence that it affected the efficient operation of the school system.   During the

---

[18] Assuming racism existed, which we do not.

44

Termination Hearing a few persons spoke of the disharmony the speech caused. However, disharmony is not synonymous with ineffectiveness. Furthermore, during Jackson's letter writing campaigns his evaluations remained constant. Thus, I find that Jackson's interest in speech outweighs the government's interest in this case.

### c. Speech Substantial Role in Employment Decision

Plaintiff contends that he has put forth evidence sufficient to establish that his "speech" played a substantial role in the defendants' decision to terminate his contract. This contention is based primarily on Mr. Ragland's note which indicated a desire on the part of the Board's attorney to terminate Jackson. Defendants assert that the reasons for which Jackson was terminated have been discussed extensively in other portions of their brief. It seems clear that even though defendants certainly had other reasons for terminating Jackson, Jackson's speech did in fact play a role in their decision, based on the considerable attention given to Jackson's speech in the Termination Hearing and in defendants' briefs.

### d. Same Employment Decision without Speech

Plaintiff contends that there is no evidence that the Board would have terminated Jackson absent the "speech." Plaintiff

45

argues that the sole reason for his dismissal was to shut him up.
Defendants contend that, assuming for the purposes of argument
that plaintiff's speech is construed as a matter of public
concern, it is clear that there were plenty of other reasons for
terminating Jackson's contract, such as the burn incident and his
failure to require students to wear gloves despite Dr. Connell's
specific instruction that he do so.

In Mt. Healthy City School Dist. Bd. of Ed. V. Doyle, the
Supreme Court discussed the dilemma where a plaintiff may be
placed in a better position because of his or her speech than he
or she would have been without it. 429 U.S. 274 (1977). In Mt.
Healthy, a non-tenured teacher was not rehired substantially
because of his protected speech, but based on other behavior of
his, he would not have been rehired anyway. The Court held that
the Board of Education must show "by a preponderance of the
evidence that it would have reached the same decision as to [the
plaintiff's] reemployment even in the absence of the protected
conduct." Id. at 287. For reasons discussed above with
reference to the Title VII, § 1981, and retaliation claims, I
conclude that the only substantial evidence is that the same
action would have been taken pursuant to Dr. Connell's
recommendation.

### D. Jackson's § 1983 Claim

In order for a plaintiff to avoid summary judgment on his claim under 42 U.S.C. § 1983, he must show the "violation of a right secured by the Constitution of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." Cummings v. DeKalb County, 24 F.3d 1349, 1355 (11th Cir. 1994), quoting Trautvetter v. Quick, 916 F.2d 1140, 1148 (7th Cir. 1990) (additional citations omitted). As previously discussed, plaintiff has alleged that he has demonstrated that his rights under the First and Fourteenth Amendments, as well as his rights secured by 42 U.S.C. § 2000e et. seq. and 42 U.S.C. § 1981, have been violated. It is undisputed that the actions in question were committed by persons in their official capacity as officers of the State.

Defendants counter that school boards "may be liable for violations of constitutional rights only when such violations occur as a result of an official policy." Tittle v. Jefferson County Comm'n, 10 F.3d 1535, 1540 (11th Cir. 1994). To show that a school board policy worked to violate his civil rights, defendants contend that plaintiff must establish the existence of such policy and that the policy operated to cause plaintiff some constitutional injury. Defendants claim that plaintiff has come

47

nowhere near to making this showing.

"Section 1983 liability cannot be imposed upon governmental entities under a theory of respondeat superior.  Instead, a government entity is liable under § 1983 only where plaintiff's injury results from the application of a policy or custom." Reynolds, 968 F. Supp. at 704, citing Monell v. New York City Dept. of Soc. Serv., 436 U.S. 658, 690-91 (1978).  A school board policy may be said to exist where (1) there is an express policy which causes a constitutional deprivation; (2)an individual policy making official causes a constitutional injury; or (3) the school board acquiesces in a wide-spread practice which is so well settled as to have the force of law.  Brown v. City of Ft. Lauderdale, 923 F.2d 1474, 1480-81 (11th Cir. 1991).  Jackson contends that the evidence clearly shows that Board member McLain was racially biased and disliked plaintiff personally, that the Board was waiting for an opportunity "to take action against" him, and that racism effectively permeated the Talladega school system.  For the same reasons discussed with reference to the Title VII and § 1981 claims, this claim will be dismissed.

### III.  CONCLUSION

The Court notes that the action taken was primarily based on a perception developed by a newly selected (June 16, 1996)

48

Superintendent of Education, Dr. Peggy Connell.  The denouement,
as far as any purported illegal motivation(s), came on October
25, 1996 when Dr. Connell recommended to the defendant Board that
plaintiff's teaching contract be terminated.  There is no
substantial evidence that any other individuals were ultimately
motivated by anything other than Dr. Connell's recommendation and
the evidence.

The Court further notes that, somewhat unusually, the
recommendation of Dr. Connell and the Board's decision to act
upon it has been upheld by the Alabama State Tenure Commission
and that the EEOC determined that:

> It is undisputed in the record that you were discharged
> by the employer named in the charge for insubor-
> dination, neglect of duty, incompetency, and other good
> and just cause. There is no showing that any other
> employee exhibited, or that any other employee was
> accused of exhibiting, similar performance or conduct,
> yet was treated differently.  There is, similarly, no
> showing of a connection between any protected activity
> and the action of which you have complained in your
> charge.

The EEOC thus determined that there was no probable cause to
determine that the plaintiff was the victim of discrimination or
retaliation.

Again, the focus should be on what motivated Dr. Connell.
There is no substantial evidence that she discriminated or

49

retaliated against plaintiff.  The nature and content of
plaintiff's comments bring into question his fitness
to perform his duties in the classroom.  See Pickering, 391 U.S.
at 573 n.5.  Defendants' motion will be granted.

This ___ day of November, 1999.

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE

50