# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

02 APR 30 PM 4:06

U.S. D....

N.D. .. A.. .

| | | |
|---|---|---|
| ROLLEN JACKSON, | ] | |
| | ] | |
| Plaintiff(s), | ] | |
| | ] | |
| vs. | ] | CV-98-N-1851-E |
| | ] | |
| TALLADEGA COUNTY BOARD OF EDUCATION, | ] | |
| | ] | |
| Defendant(s). | ] | |

**Memorandum of Opinion**



**ENTERED**

MAY 0 1 2002

## I.    Introduction

The court has for consideration the motion of the defendant Talladega County Board

of Education (hereinafter "the Board") for summary judgment, filed February 14, 2002.

(Doc. # 122).  The above-styled action has a lengthy history, that traces its way past three

judges of this court (including the undersigned), and a three-judge panel of the Eleventh

Circuit Court of Appeals.  This history is of some relevance – as it bears upon the issues

and arguments now before the court – and will be discussed in further detail *infra*.  In brief,

the Board seeks summary judgment on *inter alia* the ground that the claims of plaintiff

Rollen Jackson fail as a matter of law in light of newly submitted evidence and the Eleventh

Circuit case *Rollins v. State of Florida Department of Law Enforcement*, 868 F.2d 397 (11th

Cir. 1989).  The issues have been briefed by the parties and are now ripe for decision.

Upon due consideration, the court finds summary judgment due to be granted in part and

denied in part.

## II.   Background

### A.   Procedural

Rollen Jackson commenced the above-styled action on February 4, 1998, in the United States District Court for the Middle District of Alabama. In his complaint he alleged that the Board and school superintendent Dr. Peggy Connell discriminated against him by terminating him, retaliated against him for the exercise of his First Amendment rights, and violated his First Amendment right to free speech. See 42 U.S.C. 2000e *et seq.*; 42 U.S.C. §§ 1981, 1983. The action was subsequently transferred to the District Court for the Northern District of Alabama (Propst, J.) on September 21, 1998. On November 15, 1999, the district court granted summary judgment in favor of Dr. Connell and the Board.

Mr. Jackson appealed this decision to the Eleventh Circuit Court of Appeals, and on February 21, 2001, that court affirmed the decision of the district court in part, and reversed the decision in part and remanded the case for further proceedings. The circuit court upheld the district court's award of summary judgment in favor of Dr. Connell. As to the Board, however, the court reversed, finding:

> The Board did not independently articulate reasons for its decision to terminate Jackson. Only one Board member, Joe Duncan, was deposed prior to summary judgment. In his deposition, Duncan expressed concern that no terminable offenses were established at the hearing and that Jackson was not terminated for legitimate reasons. Accordingly, summary judgment for the Board on Jackson's race discrimination claims was improperly granted.

*Jackson v. State of Alabama Tenure Comm'n*, No. 99-15123, Doc. # 40, p. 6; *see also* Doc. # 126, Ex. 23, p. 6. (citations and footnote omitted). The court likewise found summary judgment inappropriate as to Mr. Jackson's First Amendment and retaliation claims.

2

Specifically, the court observed that the Board had neither raised the affirmative defense of *Mount Healthy* nor articulated any reason for Mr. Jackson's termination. *See id.*, p. 7; *see also Mount Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977). These reasons rendered inappropriate any award of summary judgment in favor of the Board.

On remand the action was reassigned (Buttram, J.), and on July 16, 2001, it was tried to a jury. At the close of both the plaintiff's case-in-chief and its own case-in-chief, the Board moved pursuant to Rule 50 of the Federal Rules of Civil Procedure for judgment as a matter of law. The court reserved its ruling on these motions and allowed the claims to proceed to the jury. On July 20, 2001, the jury returned a verdict in favor of the Board on Mr. Jackson's discrimination and First Amendment claims, and returned a verdict in favor of Mr. Jackson on his retaliation claim. The jury awarded Mr. Jackson $36,000 in compensatory damages and $150,000 in punitive damages. On July 31, 2001, the court denied the Board's renewed motion for a judgment as a matter of law, and entered a final judgment in the case. The court awarded Mr. Jackson $457,030.08 in damages ($234, 515.67 in back pay; $36,514.41 in front pay for one year, in lieu of reinstatement; $36,000 in compensatory damages; and $150,000 in punitive damages). On August 14, 2001, the court awarded attorneys fees and expenses in the amount of $232,064.80.

The Board subsequently moved pursuant to Rule 59(e) of the Federal Rules of Civil Procedure for a new trial, or in the alternative to alter or amend judgment. That motion was denied. However, the Board filed a renewed motion for new trial pursuant to Rule 60(b)(2) and (6) of the Federal Rules of Civil Procedure, when it came to light that one of the jurors in the case failed to disclose a previous felony conviction on a juror questionnaire or to

3

Judge Buttram when he examined the jury venire in open court. On October 12, 2001, the court granted the Board's motion for new trial, set aside the jury verdict and vacated the entry of final judgment in the case. The case was set for trial on November 26, 2001; however, on the day of trial, Judge Buttram recused himself on oral motion of the defendant. The action was thereafter reassigned to the undersigned. On December 4, 2001, the Board moved this court to schedule a status conference, so as to facilitate the re-trial of this action. That conference was held on January 15, 2002. During said conference, the Board orally represented to the court that there remained certain issues that were appropriate for disposition on motion for summary judgment. After considering this request and a spirited opposition proffered by counsel for Mr. Jackson, the court on January 16, 2002, issued a schedule for the submission of additional dispositive motions. The Board subsequently filed its motion for summary judgment – the motion now before the court – within the allotted time.

### B.     Factual[1]

Rollen Jackson was hired by the Board in 1977, and served as a welding instructor at Pittard High School, a vocational high school. He was granted tenure after three years, and worked at Pittard until his termination in 1996. During his employment, Mr. Jackson intermittently wrote letters to school officials and Board members alleging racial

---

[1] Both this court and the Eleventh Circuit have had occasion to recite the relevant facts underlying this action. (Doc. # 34; 40). This court will not endeavor to rehash or modify these iterations, but will instead incorporate them with the previously unconsidered evidence now before this court.

4

discrimination within the Talladega school system. Many of these letters contained caustic and pointed language, attacking the recipients and/or others mentioned therein.[2]

Matters regarding Jackson and his charges came to a head in 1996. In June, Dr. Connell became the new superintendent for the Talladega County School System, replacing Dr. Lance Grissett. In September, Mr. Jackson sent her a letter, raising concerns about student classroom safety. Before Dr. Connell could reply, a special education student in Mr. Jackson's class suffered second and third degree burns on the arm with a welding torch. Shortly thereafter on September 13, 1996, Mr. Jackson and Dr. Connell met. During the meeting–described by both as friendly and cordial–Dr. Connell asked Mr. Jackson to require all students to wear gloves while welding. During a later investigation authorized by Dr. Connell, however, students in Mr. Jackson's class were observed not wearing gloves while welding.[3]

Less than a week later, Mr. Jackson addressed a letter to his supervisor, Pittard principal Sally Chastain, and forwarded a copy to Dr. Connell. In the letter, he expressed concern regarding an alleged gang-related altercation at Pittard. (Doc. # 124, Ex. 25). Six days later he addressed another letter, this time to Dr. Connell. Copies were sent to, *inter*

---

[2] The Eleventh Circuit described some of them as "personally insulting and otherwise provocative." This court, in its previous opinion on summary judgment, described them as "contain[ing] acerbic statements regarding the letters' recipients personally." Several letters are discussed and considered in more detailed fashion *infra*.

[3] Plaintiff disputes this evidence, claiming that there was no evidence that the students were actually using torches at the time the investigator observed the class. Moreover, plaintiff claims that given the fact that not all students weld in a given class, it is possible that the investigator observed students without gloves who were not using the torches. The evidence before the court seems to directly contradict these averments. In a memorandum dated September 16, 1996, the investigator clearly states that "When I walked into the welding class to check the number of students during first period, I did not observe any students wearing gloves while using torches at a work bench." (Doc. # 124, Ex. 24). Dr. Connell likewise stated during trial that "[the investigator] observed ... that students still were not wearing gloves when they were welding." (*Id.*, Ex. 1, p. 415).

*alia*, all five members of the Board. In this letter, Mr. Jackson expressed displeasure with an incident involving the Board's refusal to hear him without his being listed on the agenda. In the letter he also stated, "I think that Dr. Connell has demonstrated how she feels about the black community. She has our vote of no confidence." (*Id.*, Ex. 27).

Dr. Connell ultimately recommended the commencement of termination proceedings against Mr. Jackson under the Alabama Teacher Tenure Act, at the October 25, 1996 meeting of the Board.[4] Her recommendation carried unanimously. On November 19, 1996, the Board held a hearing to consider the termination of Mr. Jackson's employment. The hearing lasted approximately seven hours, with Mr. Jackson represented by counsel. After recessing for two days, the Board returned on November 21, 1996, for a public vote. Three members—Randy Howell, Johnny Ponder and Eddie McLain—voted in favor of termination. One member—Joe Duncan—voted against termination. One member—Larry Morris—abstained.

During the trial, the three Board members who voted in favor of termination explained the basis for their decision. Mr. McLain offered the following explanation:

> Personally, I voted to terminate Mr. Jackson's contract on a variety of reasons. Letter writing, which was part of that. I think he neglected his students, he allowed them to sleep in class. Mr. Jackson, himself, slept during what was a planning period in which he had complained about it and his supervisor found him asleep.

---

[4] Several events, the exact context and content of which are in dispute, apparently took place between September 25 and October 25 and precipitated Dr. Connell's recommendation. One such event, the appearance by Mr. Jackson at a Board meeting at which time he allegedly distributed confidential records, generated a letter from John Ragland, the coordinator of special education at Talladega, to Dr. Connell in which Mr. Ragland stated: "[Board attorney Ralph Gaines] stated that this might be what we have been waiting on to move toward taking action on Mr. Jackson."

There was testimony at the Board hearing where Mr. Jackson was filing false travel vouchers. He would say that he had been to a particular agency to talk about employment of his students and it came back that he had not been there. He would order, there was an occasion where his supervisor, I think it was Ms. Chastain at the point, asked him to fill out a travel voucher for a request, where he had supposedly been to a summer conference but evidence was presented that Mr. Jackson never even attended that conference. She asked him at one point to fill out his travel voucher for the month and he took a calendar standing at the desk in the office at the vocational school and just went through the calendar and arbitrarily started making dates when he went on trips. He failed to follow ordering procedures for purchase orders. He would go off on his on and order and buy supplies without following the purchase order system. And as part of the school system, that is intrinsically important within the school system to follow proper procedure of purchasing. His criticism, openly defiant criticism of his supervisors, may have played a very important role.

At one occasion, we had a school board meeting where Mr. Jackson came to the school board meeting and disclosed special education students' individual education plans. Those are highly confidential plans that are protected by federal law as well as state statute. And Mr. Jackson, on his own, brought those special education files and passed them out at the school board meeting which was severely damaging, or could be, has a potential of being severely damaging to those students.

Mr. Jackson failed to use proper procedure in his shop. He had been instructed by the Superintendent that his students must wear gloves for the welding. The textbooks even indicate that students must wear gloves. And I think we have to keep in mind that these students are 14 to 18 years old and they're coming in there and, you know, kids are going to play around. And to allow these students to come to a shop and to light a welding torch, which I don't know the temperature of a welding torch, but it is extremely hot. To allow them to get into the shop and to use welding equipment without following the proper procedure, after he had been told that he must follow proper procedure. And then, because of his lack of following procedure, a student suffered third-degree burns in that shop.

Those are some, I don't know that that's all inclusive, but those are some of the primary reasons why I voted to do what I did. There was a safety issue, there was a reliability issue on Mr. Jackson's part. There was issues of just blatant insubordination.

7

I considered all the evidence the night that we voted to do what we did. I carefully considered that evidence. I carefully considered that evidence for two solid days. We had a Board meeting two days after the evidence was presented. And after carefully considering that evidence, I voted to uphold the Superintendent's recommendation and I feel that it was for the betterment of the school system that Mr. Jackson's employment was terminated with the Talladega County Board of Education. There were so many breaches and I felt that the evidence was overwhelming.

(Doc. # 124, Ex. 1, pp. 266-270.)

Mr. Howell, the second member of the Board casting an affirmative vote, stated:

Well, after having served for almost nine years on the Board of Education and having received numerous letters from Mr. Jackson that had contents which personally attacked my character and integrity, having heard complaints from other individuals concerning safety issues, and then the evidence presented that night, the sworn testimony showing how he had made unauthorized purchases, sleeping in class, all the issues that we've talked about, that has been discussed in this court concerning the safety issues. It was just a cumulation of things that over a period of years the evidence just continued to stack up that would warrant, at least in my estimation, a justified termination.

(*Id.*, Ex. 1, p. 977.)[5]

---

[5]The following colloquy between Mr. Howell and defense counsel further illustrates the basis for his decision:

Q.      Mr. Howell, as a Board member, do you take issue with someone raising a complaint of racial discrimination with you?
A.      No, I do not.
Q.      Or with raising an issue of student safety?
A.      No.
Q.      What is different about Mr. Jackson's letters?
A.      What's different about Mr. Jackson's letters is, I don't have a problem with someone raising issues or receiving letters concerning race problems or safety problems or facility problems. It's almost weekly that I get a call or a letter about something going on.

But, to me, what's different in Mr. Jackson's letter is the inflammatory, premeditated, hateful, angry, unjustified things he says. That, to me, would go far beyond the realm of being a Christian gentleman. It goes far beyond having any due respect or courtesy toward an employee or another human being. I found it very, very offensive and very hurtful that he would use such, I mean, caustic references to me as an individual. I can't comprehend that.

Q.      Was your decision to terminate Mr. Jackson based, in part, on these personal and

Finally, Mr. Ponder explained his reasons for voting in favor of Dr. Connell's recommendation for termination:

> Well, one of the big things with me was the evidence that we heard about the falsifying of the expense reports.  To me, that's nothing more than stealing.  And the taxpayers in District 3 elected me to look out after their tax money.  So that was a very important thing.  The safety of the students was another real important thing, the child getting burned, the sleeping in class.
>
> The personal attacks, of course, was something. Even though none of them were really ever directed at me, I don't think I ever got but one letter, and I was just copied.  I do think one of the letters he referred to me as supporting racism or something.  I don't remember exactly what it was.  The sleeping in class, the not turning the paperwork in on time and stuff like that.  That was a big thing with me.

(*Id.*, Ex. 1, p. 969). Mr. Jackson subsequently appealed the Board's decision to the Alabama State Tenure Commission.  On February 27, 1997, that commission upheld the decision of the Board.

## III.    Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party

---

caustic attacks?

A.     As far as the problems he has about safety or that we have race problems, yes, that's fine.  But, in part, to show such blatant disregard and total disrespect for an employer and a minister, yes, that played a part in it.  But it was just a part.

Q.     What was the other part?

A.     Well, the evidence presented that night, the student being burned, student safety issues, unauthorized purchases, the discrepancy in his claim for travel.  Just all of those things.  It all stacks up over a period of years.

(*Id.*, Ex. 1, pp. 994-95.)

9

asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotations omitted); *see also Crawford-El v. Britton*, 523 U.S. 574, 600 n.22 (1998). The movant can meet this burden by presenting evidence showing that there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. Once the moving party has met this burden, "the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)).

The court must grant a motion for summary judgment if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249 (citations omitted); *accord Dzikowski v. NASD Regulation, Inc. (In re Scanlon)*, 239

10

F.3d 1195, 1198 (11th Cir. 2001); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). In rendering its decision, "[a] court 'must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'" *Hinson v. Clinch County Bd. of Educ.*, 231 F.3d 821, 826-27 (11th Cir. 2000) (quoting *Reeves*, 530 U.S. at 150).

## IV.   Discussion

### A.   Law of the Case

Before reaching the issues presented by this motion for summary judgment, the court must first address an argument proffered by the plaintiff. Mr. Jackson claims that the "law of the case" doctrine precludes the court from disturbing the Eleventh Circuit's decision with respect to his Title VII discrimination and retaliation claims. "The defendant has not proffered any new evidence nor substantially different evidence which was not available to it at the time of the filing of [the first motion for summary judgment, the motions for judgment as a matter of law, or the motion for a new trial.]" This argument and the cases cited in support (*see, e.g., Oladeinde v. City of Birmingham*, 230 F.3d 1275 (11th Cir. 2000)), slightly confuse the various factual circumstances to which the law of the case doctrine applies.

"Under the law of the case doctrine, both the district court and the appellate court are generally bound by a prior appellate decision of the same case. The . . . doctrine, however, bars consideration of only those legal issues that were actually, or by necessary implication, decided in the former proceeding." *Oladeinde*, 230 F.3d at 1288 (citation and quotations omitted). There are exceptions to this rule, however, such as when new and

11

substantially different evidence is produced; there has been a change in controlling authority; or the previous decision was clearly erroneous and would work manifest injustice. *See id.*; *see also In re United States*; 60 F.3d 729, 731 n.2 (11th Cir. 1995); *United States v. Robinson*, 690 F.2d 869, 872 (11th Cir. 1982). The rule of law stated in such cases as *Oladeinde*, however, dictates how this court must act with respect to the decision of the Eleventh Circuit. It does not inform the court with respect to the decisions rendered on the Board's motions for judgment as a matter of law or for a new trial. These situations are controlled by another branch of the law of the case doctrine, which establishes that an

> issue decided at one stage of a case is binding at later stages of the same case. . . . Under the law of the case doctrine, a legal decision made at one stage of the litigation, *unchallenged in a subsequent appeal when the opportunity existed*, becomes the law of the case for future stages of the same litigation, and the parties are deemed to have waived the right to challenge that decision at a later time.

*United States v. Escobar-Urrego*, 110 F.3d 1556, 1560 (11th Cir. 1997) (emphasis added).

Although these standards together define the contours of this court's approach to the motion before it, Mr. Jackson's arguments primarily center around the appellate decision. He contends that the Eleventh Circuit reached the conclusion it did both "because the Board failed to independently promulgate its reasons for terminating the plaintiff *and because* Joe Duncan stated that the plaintiff had not committed any terminable offenses and the Board's reasons for terminating him were not legitimate." According to Mr. Jackson, the controlling authority underlying this decision has not changed, and the Board has not come forward with new or different evidence that might serve to articulate the reasons or findings

by the Board as to his termination.  The decision of the Eleventh Circuit is, he concludes,
the law of the case.

The court does not agree with Mr. Jackson's interpretation of the Eleventh Circuit's
decision or the current state of the record.  In reversing the district court's conclusions as
to Mr. Jackson's discrimination claim, the circuit court held:

> The Board did not independently articulate reasons for its decision to
> terminate Jackson.  Only one Board member, Joe Duncan, was deposed prior
> to summary judgment.  In his deposition, Duncan expressed concern that no
> terminable offenses were established at the hearing and that Jackson was not
> terminated for legitimate reasons.  Accordingly, summary judgment for the
> Board on Jackson's race discrimination claims was improperly granted.

*Jackson v. State of Alabama Tenure Comm'n*, No. 99-15123, Doc. # 40, p. 6; *see also* Doc.

# 126, Ex. 23, p. 6. (citations and footnote omitted).  This holding does not equate to a
holding that the testimony of Mr. Duncan substantively contributed to the impropriety of
summary judgment.  Nor does it necessarily implicate such a conclusion.  The holding
simply provides (and turns upon) what the Board did not do.

The holdings of the Eleventh Circuit that are of greater significance to the current
motion– insofar as the law of the case doctrine is concerned–are those holdings rendered
as to the First Amendment and retaliation claims.  As to the former, the court of appeals left
undisturbed the findings of the district court, and instead reversed the award of summary
judgment on the ground that the "Board failed to raise the *Mount Healthy* defense . . . ." *Id.*,
p. 7.[8]  With respect to the retaliation claim, the Eleventh Circuit offered this rather succinct

---

[8] In further explanation of this conclusion – and consistent with its initial holding as to the discrimination
claim against the Board – the circuit court added that "the Board has failed to articulate any reason for Jackson's
termination and, therefore, cannot yet establish that Jackson would have been terminated absent his protected
speech." *Id.*, p. 7.

13

determination: "Because summary judgment for the Board of Jackson's discrimination and First Amendment claims has been reversed, summary judgment for the Board on his retaliation claim is also improper for the reasons stated above." *Id.*, pp. 7-8.

As Mr. Jackson himself realizes, the circuit court's decision as to the First Amendment claim clearly envisions further ruminations from a lower court. However, Mr. Jackson fails to acknowledge the Eleventh Circuit's decision to let stand the district court's findings that Mr. Jackson's speech involved a matter of public concern; that his interest in speaking outweighed the interest of the Board in efficient public service; and that his speech played a substantial role in the Board's decision to terminate him. The implications of this decision are important, and are discussed in greater detail *infra*.

Mr. Jackson does argue that the law of the case doctrine applies to the Eleventh Circuit's treatment of his retaliation claim. He argues that the Eleventh Circuit "was aware of the nature and content of the plaintiff's letters when the appeal . . . was heard . . . [and] did not overturn the district court's findings that the plaintiff's speech involved matters of public concern and that his free-speech interest outweighed that of the government in effective public service." Given this, he concludes, the motion of the Board, insofar as it is based upon the *Rollins* case, must fail.

The court disagrees for two reasons. First, this court believes that the statements Mr. Jackson has taken from the circuit court's opinion are of no apparent consequence to the actual holdings announced. If anything, they serve as context; and context and law of the case are two entirely different things. A second, but related reason arises from the fact that these statements, even when taken as binding, do not foreclose the applicability of *Rollins*.

14

The *Rollins* case, discussed in greater detail *infra*, restated the former Fifth Circuit rule that not all employee behavior mounted in opposition to allegedly unlawful employer activity is statutorily protected expression under 42 U.S.C. § 2000e-3(a).  The court explained that a determination of whether behavior is protected "is made on a case by case basis by balancing the purpose of the statute and the need to protect individuals asserting their rights thereunder against an employer's legitimate demands for loyalty, cooperation and a generally productive work environment." *Rollins*, 868 F.2d at 401.  None of these factors are discussed within or are affected by the decision of the Eleventh Circuit.  This court is, therefore, free to consider Mr. Jackson's behavior under the standard set forth in *Rollins*.[7]

In addition to the holdings of the Eleventh Circuit, the record now contains testimony–obtained under oath and at trial before a jury–of the three Board members who voted to terminate Mr. Jackson.  The substance of that testimony relates the reasoning of these individuals in deciding to terminate Mr. Jackson.  These statements thus constitute new evidence not previously before the court on summary judgment, or before the Eleventh

---

[7]The court recognizes that an application of *Rollins* necessarily entails a finding as to an element of Mr. Jackson's prima facie case of retaliation (i.e., statutorily protected expression).  Law of the case principles would preclude such a consideration if the Eleventh Circuit addressed or necessarily implicated his prima facie case.  In reviewing the appellate court opinion, however, this court finds no real discussion of the prima facie case supporting Mr. Jackson's retaliation claim.  In fact, in reviewing that decision and the original decision of the district court, this court believes that the claim of retaliation under Title VII was largely analyzed in a light coextensive with Mr. Jackson's First Amendment claim. *See* Doc. # 34, pp. 39-40, 41-42; *Jackson*, Doc. # 40, p. 7-8.  The case law applicable to the two claims, however, shows that they are subject to separate and distinct analyses. *See Lipphardt*, 267 F.3d at 1186 (discussing standard applicable to a Title VII retaliation claim); *Bass v. Bd. of County Comm'rs*, 256 F.3d 1095, 1117-18 (11th Cir. 2001) (same); *see also Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1563-64 (11th Cir. 1995) (discussing standard applicable to First Amendment retaliatory discharge claim); *cf. Johnson v. City of Fort Lauderdale*, 148 F.3d 1228, 1230-31 (11th Cir. 1998) (discussing Title VII and § 1983 as providing parallel remedies for discrimination in the public sector).

Assuming *arguendo* that the Eleventh Circuit did address or necessarily implicate the prima facie case supporting Mr. Jackson's retaliation claim, the court still believes that an application of *Rollins* would be appropriate, as it would qualify under the exceptions to the law of the case doctrine.  This court thus concludes that law of the case principles do not preclude the court from reviewing the new arguments proffered by the defendant.

Circuit on appeal.  Moreover, these statements cast the case in a light neither decided nor implicated by the appeal to the Eleventh Circuit.  The law of the case doctrine does not control this court's consideration on the Board's motion for summary judgment.

### B.   Mr. Jackson's Claim of Retaliation

The argument of the Board against Mr. Jackson's claim of retaliation is straightforward.  The Board contends that the case of *Rollins v. State of Florida Department of Law Enforcement* dictates the issuance of judgment in favor of it.  The court largely agrees.

To prevail on a retaliation claim, a plaintiff must establish a prima facie case showing of "(1) statutorily protected expression, (2) adverse employment action, and (3) a causal link between the protected expression and the adverse action.  One example of statutorily protected expression is 'opposing any practice made an unlawful employment practice' by Title VII . . . ."  *See Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186-87 (11th Cir. 2001) (citations and quotations omitted) (quoting 42 U.S.C. § 2000e-3(a)).  For a plaintiff to demonstrate this type of statutorily protected expression, a plaintiff must show that he possessed a good faith, reasonable belief that his employer is engaged in unlawful conduct.  Such a showing includes both subjective and objective quanta of proof: the (subjective) belief that the employer was engaged in unlawful employment practices, and the (objective) reasonableness of that belief, in light of the facts and record presented.  *See id.*, 267 F.3d at 1187.

The *Rollins* case illustrates the principle that certain forms of opposition do not necessarily fall within the ambit of protection afforded by 42 § U.S.C. 2000e-3(a).

16

> Though the legislative history of section [2000e-3(a)] is murky, it is well established that the protection afforded by the statute is not absolute. This court has repeatedly recognized that some otherwise protected conduct may be so disruptive or inappropriate as to fall outside the statute's protection. We have held that to qualify for the protection of the statute, the manner in which an employee expresses her opposition to an allegedly discriminatory employment practice must be reasonable. This determination of reasonableness is made on a case by case basis by balancing the purpose of the statute and the need to protect individuals asserting their rights thereunder against an employer's legitimate demands for loyalty, cooperation and a generally productive work environment.

*Rollins*, 868 F.2d at 401. The backdrop of this decision involved a district court finding that an employer–the Florida Department of Law Enforcement (FDLE)–had shown a legitimate, non-discriminatory reason for denying the Rollins' request for promotion when it offered as its reason the fact that she had disrupted the work place by repeatedly making spurious claims of racially disparate treatment in an extremely hostile and antagonistic manner. On appeal, Rollins argued that the reason proffered by FDLE could not be used as proof of a non-discriminatory reason, because § 2000e-3(a) generally prohibits an employer from retaliating against an employee for complaining of racial discrimination. *See Rollins*, 868 F.2d at 398.

In affirming the district court's award of summary judgment in favor of FDLE, the Eleventh Circuit applied the standard set forth *supra* and stated that the

> record reveals . . . [that the employer denied plaintiff's] applications for promotions because she had earned the reputation as a disruptive complainer who antagonized her supervisors and colleagues and impaired the morale of her unit. Such conduct, even when associated with complaints of discrimination, has been held to fall outside the protection of section [2000e-3(a)] and to provide the employer with a legitimate basis for its action.

In support of this conclusion, the court discussed the following facts which it felt reasonably

justified its conclusion and the conclusion of the district court.

> First . . . Rollins habitually bypassed the chain of command by bringing her
> complaints of discriminatory employment practices directly to the
> Commissioner of the FDLE, and on one occasion to the Governor of Florida,
> rather than to her unit supervisor, assistant supervisor, bureau chief, deputy
> director, or director.  Rollins, moreover, refused to follow the avenues
> prescribed for lodging such complaints; though she knew that FDLE time
> sheets were not to be used for recording grievances, she frequently wrote
> her allegations of discrimination upon them.  Second, the sheer number and
> frequency of Rollins' complaints of discrimination, most of which were plainly
> spurious, was overwhelming. . . . Alan Spradley, Rollins' unit supervisor . . .
> said that he spent more time addressing Rollins' repeated complaints of
> racially discriminatory practices than those raised by all of his other
> employees combined.  He testified that Rollins' constant complaining and
> unsupported allegations had a damaging effect on morale within his unit.
> Third . . . Rollins frequently expressed her complaints in an insubordinate and
> antagonistic manner.  According to Spradley, on one such occasion Rollins
> called him a fool and told him to look up the definition and it's accurate.
> Spradley also stated that Rollins told him that Charles Jacobs, the FDLE
> Director, was untrustworthy and that he lied with a straight face.

*Rollins*, 868 F.2d at 399.

The Board contends that Mr. Jackson's conduct, while in part associated with

complaints of discrimination, went far beyond the conduct of the plaintiff in *Rollins*, and

therefore falls outside the protection of § 2000e-3(a).  A review of some of the letters sent

by Mr. Jackson during his employment by the Board corroborates this characterization.[8]

For example, Mr. Jackson received the following written comments in an evaluation

by his supervisor L. C. McMurphy on January 17, 1990:

---

[8] The court has chosen not to edit the portion of the letters included in this opinion or clutter these portions with notations of possible error.  The letters that appear in this opinion have been reproduced verbatim from the evidence in the record.

> Students were given assignments and went to work using independent practice. Mr. Jackson is very zealous of his department; not as much so of total school program. Works hard at job placement but spends a lot of class time in this activity. Have concerns with so many former students coming back to practice for a test and would recommend this be done after present students leave. I do have problem coming up with all the resources Mr. Jackson requests for his department. As majority of teachers at PAVS, we need to improve lesson plan format and lesson plan book.

(Doc. # 124, Ex. 37). Mr. Jackson refused to sign this evaluation, but he did respond with

a letter to the Board, in which he stated the following:

> I am registering a complaint that each year my evaluation by Mr. McMurphy is racist and biased. It doesn't take a Yale lawyer to see that the front side of the personnel performance form I have all acceptables and on the back side I have a long list of recommendations. I think it compliments his [McMurphy's] intelligents the racism that he displays. . . . It clearly shows racism which he has displayed throughout the years. . . . Teachers at Pittard have been promoted because of their racist slurs and sitting in their office drinking coffee. How long will Dr. Grissett and the County Board of Education allow this to continue?

(*Id.*, Ex. 11). Three days later, Mr. Jackson wrote a letter to Mr. McMurphy, in which he

stated:

> Mac, you asked me for my comment on my evaluation I find it insulting, racist and bias and unprofessional. Each year my credibility is destroyed a little bit more by your support and acts of racism towards me and the black students at Pittard. I can't see how the Talladega County Board of Education put up with and support you're the racist acts. . . . You mentioned about lesson plans. If you are first in the state in certification and meeting your job description, I don't think you need to do anything as far as lesson plan. I am tired of you telling or reading something that someone else said would work. . . . Mac, I think you need to examine yourself. My father said once, son, don't let other folks do too much for you. I think that is your problem. No! I don't have any confidence in your leadership, you make differences. If you would stop concentrating on racism so much and put more time on being honest and treating people right. You have let the secretary and Ms. Chastain and Neal Phillips impregnate that school with racism. Sometimes I think that you don't have the skills to operate the school and these people

> know you don't, this is why they can run it. They can tell you what is going to happen and what you are going to think before you say a word, they have that much influence over you. . . . I wonder if your God is white or black.

(Id., Ex. 12). Then school superintendent Dr. Grissett asked his assistant superintendent Dr. Ed Hall (an African American) to investigate the allegations of Mr. Jackson. Following a meeting between the two men, Mr. Jackson telephoned the home of Dr. Hall, and explained that he had additional information in support of his allegations. Mr. Jackson was directed to mail the information. The following is in part what Dr. Hall received:

> As long as I can remember you were the person whom most of the young guys looked up to and wanted to be like. I can remember back when I was in my early teens wanting to dress like you, wanting to be intelligent like you. You were the kind of guy that the young guys wanted to be like. . . .
>
> Seeing you the other day in my office, I saw a black overseer with his whip, riding on his stallion with all of the noble trust and loyalty that the master invested in him. In the black community for years we have known any time there is a racial issue they always send the black master, riding on his white horse, to suppress any opposition. Immediately afterwards, the master takes the white horse and the whip and put his big black boy back in the fields.
>
> Ed, it has been a joke at school and throughout the system about your position and authority. . . . The day after you left I passed a group standing on the sidewalk talking. They immediately started talking loud "Who is Ed Hall?" Jimmy Hayes has his job, they have stripped him of his power. He is just like us, nobody. I don't see why folks run to him thinking that he could do something. Grissett doesn't need him anymore. It really hurts to see Mac and the rest laugh in your face and call you Dr. Hall and when you leave laugh at you. . . . You smile and grin, shake hands, make speeches and promises yet disappear when special black needs are voiced. A man without character.

(*Id.*, Ex. 14).

Another example is a letter Mr. Jackson sent to Board member Eddie McLain on March 6, 1996.

I spoke with you at the teacher's meeting, you seemed proud to be a bigot and a racist in front of Jimmy Hayes. You are not only acting as Grand Wizard of the Ku Klux Klan, now racial genocizing and ethnic genocizing as well. Once I thought, Eddie, that you and preacher Randy Howell were intelligent but now I see that neither of you have good walking around sense. It takes trashy people to think for the whole community. God cares for us all. In the book of Revelations 20th Chapter, the first people to go to Hell are your false prophets. I have said that I would go against the tax to teach you guys a lesson, but the two of you are not worth it. I will ask for permission to speak at the next meeting to denounce your ludicrous and barbarious act. It is leaking in the Talladega County Central High School gym. A new top is needed. Lincoln needs extensive repairs. Munford needs repairing as well as Hill. You are a selfish, no-business-minded, insulting, disgusting person let alone a ethnic genocizer.

It seems as though I am not the only one who thinks that way. Here is an article, or maybe you need someone to read it for you. I doubt whether it will enlighten your Hitler views

(*Id.*, Ex. 19). The other four members of the Board were also copied on this letter. A third

example is the letter Mr. Jackson sent to Dr. Connell, who at the time had held the position

of school superintendent for little more than one month.

In the case, [Elston v. Talladega County Board of Education . . . the] Talladega County Board of Education agreed with the Eleventh Federal Circuit Court that the public could speak to the board without getting on an agenda. They also agreed to allow the ratio of teachers to reflect the make-up of the community, race wise. Let it be known, if necessary, we will petition the court to reopen or submit a new lawsuit. Let this serve to the superintendent and the county board of education as a complaint of discrimination by race.

Mrs. Faye White and Rollen Jackson asked Dr. Connell to speak to the board on issues of different concerns. At that time Dr. Connell, Superintendent of Talladega County, agreed and assured us. Mr. Eddie McClain stated that we needed to get on the agenda when it came time for us to speak. Mrs. Faye White and Mr. Rollen Jackson are both black. I, Rollen Jackson, tried to speak but was treated with no respect from Mr. Eddie McClain. The Superintendent, Dr. Connell, lost the respect of the black community first by lying saying that we would be on the agenda then saying we would have to send a written request and pass out false information. She said that it was

21

54% white and 46% black with 84% of the teachers being white and 16% of the teachers being black. I Think that Dr. Connell has demonstrated how she feels about the black community. She has our vote of no confidence. . . .

Every black that was at the meeting knew that by hiring Willis W. Walter that he was hired as a token black. We realize that is an old trick that the whites have used for generations. Dr. Morris made mention that blacks were pursuing other careers. If he was such a good friend of Dr. Ed Hall, he would know that he is over the Education Department at Talladega College which has several hundred people that are studying to become teachers.

All black colleges have discovered that they were deceived by closing or reducing their educational departments. Within the next two years these schools will be producing a majority of their students into education. So, please deplete that educational answer out of the white leaders vocabulary. It is minute; it doesn't exist anymore. Talladega County Board of Education, Superintendent and Board Members have a problem speaking with black leaders in the community. They still want to get them a token black and not have to speak with blacks that present issues of concern by the black community. Dr. Connell, you are keeping their track record. They didn't want to hire Dr. Hall because he was black so they hired you who don't want to recognize black issues. You are very deceiving like Mr. Eddie McClain who has a problem talking with blacks.

(*Id.*, Ex. 27). As noted *supra*, this letter was copied to all members of the Board, Dr. Hall (who at this point in time had resigned from his position and had litigation pending as a result of the decision to hire Dr. Connell), the Eleventh Circuit, and the United States Department of Justice.

A final example occurred during mid-October, 1996. On October 17, the attorney for the Talladega County Board wrote Mr. Jackson a letter which read in part:

This letter is written by me as attorney for the Talladega County Board of Education at the request of my client.

School officials have become very much concerned in recent months with your numerous letters to various individuals and which letters contain highly critical allegations some of which can be interpreted as libelous. On a fairly consistent basis you have wilfully created dissension in the school system.

22

While it is true that you have a right of free speech which includes the right to criticize others including your employers that is a limited right. The school board and school administrators have a duty to administer the school system in an orderly manner. Your continuous disparagement and unwarranted accusations against the superintendent and other school personnel are disruptive and interfere with the orderly and efficient administration of the school system.

Your attention is being called to these matters in an effort to seek and obtain your cooperation with the expected result that you will immediately refrain from going beyond the bounds of the exercise of the right of free speech as you have on several occasions in the recent past.

The administration and the Board of Education are viewing your recent communications and repeated verbal statements very closely. If you persist in this type of conduct, the administration and the Board will have no alternative but to take appropriate action as provided by law.

If you are represented by an attorney, I will be glad to discuss this situation with your attorney.

(*Id.*, Ex. 28). Although there is some dispute over whether Mr. Jackson received the letter

(or reviewed its contents),[9]  the record is clear that Mr. Jackson sent a letter dated October

22, 1996 to fourteen students' parents which stated in part:

On October 17, 1996, I carried some of the students' personel files to show the Board the amount of students that were in my class to make them aware of the danger and safety problems that have plagued the welding department and the necessary need for supplies and equipment. I wanted to point out the danger of having 76 students, something that I had never been accustomed to teaching and the trading of quality for quantity. But yet, I was publicly lynched by Ed McLain, the President of the Board, by saying that I carried the students' IEP's, which is the students' records and that it was illegal.

(*Id.*, Ex. 29).

---

[9]At trial, Mr. Jackson testified that he did not recall receiving the letter. However, he did recognize the signature acknowledging receipt of said letter as his own. (*Id.*, Ex. 1, pp. 741-42).

23

As discussed *supra*, in considering whether behavior is protected by § 2000e-3(a), courts should employ a balancing test and ask whether the employee's expression of opposition is reasonable.  This balancing is done on a case by case basis, and requires the court to balance the purpose of the statute and an individual's right to expression against an employer's need for on-the-job loyalty, cooperation and a productive work environment. *Rollins*, 868 F.2d at 401.  On balance here, the court finds that Mr. Jackson's statements do not qualify for protection under § 2000e-3(a).

First, the court agrees with the Board that the behavior here far transgresses that which the *Rollins* Court found beyond the protective scope of § 2000e-3(a).  The Board has come forward with numerous letters penned by Mr. Jackson to persons of all kinds: superintendents, Board members, attorneys with the National Association for the Advancement of Colored People, and the Department of Justice *inter alia*.  The frequency with which Mr. Jackson sent his letters indicates a habitual pattern not at all unlike the plaintiff in Rollins.  To describe these letters as antagonistic and insubordinate, however, would be to grossly understate their collective contents.  In *Rollins*, the illustratively caustic comments involved someone being called a fool, or untrustworthy and a liar. *Rollins*, 868 F.2d at 399.  The instant case presents examples where the plaintiff openly belittles the assistant superintendent, calling him a black overseer, and states to a new superintendent barely a month into her position that she is deceiving and has lost the confidence of the black community.  The actions of the plaintiff in *Rollins* pale in comparison to those of Mr.

24

Jackson.[10]  The court finds therefore that Mr. Jackson cannot succeed on his claim of Title

VII retaliation.  Summary judgment on that count is due to be granted.

### C.    Mr. Jackson's First Amendment Claim

Law of the case principles do affect this court's consideration of Mr. Jackson's First

Amendment claim.  In reviewing the actions of the district court, the Eleventh Circuit noted

that the district court found Mr. Jackson's speech to involve a matter of public concern; that

his interest in speaking outweighed the interest of the Board in efficient public service; and

that his speech played a substantial role in the Board's decision to terminate him.  (Doc. #

40, p. 7).  The Eleventh Circuit did not disturb these findings.  Neither will this court.  *See*

*Oladeinde*, 230 F.3d at 1288; *Escobar-Urrego*, 110 F.3d 1556, 1560 (11th Cir. 1997).[11]

---

[10]Complete reliance upon *Rollins* would be inappropriate, however, as questions concerning the protective applicability of § 2000e-3(a) must be made on a case-by-case basis.  *See id.* at 401.  The court sees nothing unique in this case, however, that might warrant greater protection for Mr. Jackson's activities than was extended in *Rollins*.  At the time of his termination, Mr. Jackson was an instructor of youth.  One would presume then that Mr. Jackson appreciated not only the values in racial harmony and equality, as well as assertiveness, outspokenness, and leadership, but also the need for loyalty, cooperation, and productivity in a group setting.  Yet even his earliest letters demonstrate adversarial and caustic tendencies which seem to have increased with the passage of time.  In a letter dated January 1, 1988, Mr. Jackson closes a lengthy letter detailing his grievances with the administration at Pittard by stating the following:

> I will no longer tolerate these vicious attacks against my human dignity and religious principles.  I will pursue every lawful means available to see that justice is satisfied.  You have established the fact that further appeals for change in your administration without outside legal, moral, political and economic intervention is to encourage your racist and dictatorial abuses.

> Elie Wiesel, accepting the 1986 Nobel Peace Prize said, 'Take Sides.  Neutrality helps the oppressor, never the victim.  Silence encourages the tormentor, never the tormented."

> I am no longer available for any talks or discussions.  My only interest is that justice against past abuses be satisfied without further delay.

> (Doc. # 124, Ex. 7).  Considering the evidence as a whole, the court cannot say that on balance, Mr. Jackson's behavior merits protection under the statute.

[11]For reasons similar to those discussed in note 6 *supra*, the court does not believe that any law-of-the-case exception applies to the treatment of Mr. Jackson's First Amendment claim.  The district court on summary judgment clearly and explicitly made findings with respect to the first three elements necessary for such a claim.  With respect to the second element – whether the employee's interest in speaking outweighs the Board's interest

Neither the decision of the Eleventh Circuit nor the decision of the district court precludes this court from considering a *Mount Healthy* defense, however. (Doc. # 40, p. 7). In reviewing the submissions of the Board, in support of summary judgment and in response to the opposition of Mr. Jackson, the court finds no effort by the Board to raise a *Mount Healthy* defense. *See Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285-87 (1977); *see also Walker v. Schwalbe*, 112 F.3d 1127, 1131 (11th Cir. 1997). Indeed, the thrust of the Board's motion for summary judgment concerns the applicability of the First Amendment to Mr. Jackson's letters. (Doc. #, pp. 45-49). This issue has been decided by the district court, however, and left undisturbed by the Eleventh Circuit. The Board having failed to show any reason why summary judgment is due on the First Amendment claim, the court concludes that the claim may proceed to a jury.[12] Summary judgment is due to be denied.

---

in efficient public service – the court specifically rejected the argument (advanced now by the Board) that Mr. Jackson's speech merited no First Amendment protection.

> Speech which merits no First Amendment protection must so severely impede the effectiveness of both the speaker and the recipient that the governmental interest at stake clearly outweighs the speech interest. . . . [N]owhere in the voluminous documents submitted to the court is there evidence that Jackson's actions actually led to ineffectiveness. It is certainly clear that people felt annoyed, insulted, and bothered by the letters and considered them unprofessional, but there is no evidence that it affected the efficient operation of the school system. During the Termination Hearing a few persons spoke of the disharmony the speech caused. However, disharmony is not synonymous with ineffectiveness.

(Doc. # 34, p. 44-45 (citations omitted)).

[12]Not only has the Board failed to show any reason why summary judgment is proper on the First Amendment claim, but Mr. Jackson has come forward with evidence suggesting that summary judgment might well be inappropriate even in the face of a properly presented *Mount Healthy* defense.

### D.    Mr. Jackson's Discrimination Claim

The Board does not challenge the fact that Mr. Jackson has established a prima facie case of discrimination.  The Board argues that it has articulated a number of legitimate non-discriminatory reasons for his termination, and that Mr. Jackson cannot demonstrate that these reasons are pretexts for discrimination.  The articulated reasons stem from testimony at trial by the three members of the Board who voted in favor of Mr. Jackson's termination: Eddie McLain, Johnny Ponder, and Randy Howell.  Although the proffered reasons seem to vary among the three, the recurring ones include the letter writing, the alleged filing of false expense reports, the wrongful distribution of confidential student records, and poor job performance.

The classic rubric of *McDonnell Douglas* controls the analysis here.  "*McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792, 802 (1973)] and subsequent decisions have 'established an allocation of the burden of production and an order for the presentation of proof in . . . discriminatory-treatment cases.'"  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993) (quotations omitted)).  Upon establishing a prima facie case, the burden shifts to the employer to "'produce evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.'"  *Reeves*, 530 U.S. at 142 (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).  The employer's burden here is one of production, not persuasion, and involves no credibility assessment.  *See id*. (citing *St. Mary's Honor Center*, *supra*, at 509).

> [O]nce the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision – must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.  That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence.  Moreover, although the presumption of discrimination drops out of the picture once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.

*Reeves*, 509 U.S. at 143 (quotations and citations omitted); *see also Hinson v. Clinch County*

*Bd. of Educ.*, 231 F.3d 821, 830 (11th Cir. 2000).

> A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer.  Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.

*Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000).  Consistent with the

*McDonnell Douglas* analysis, Mr. Jackson argues that the Board's proffered reasons are not

worthy of credence.  He points out, *inter alia*, that his personnel file contained no record

of complaints of the type cited by the Board as grounds for termination; that two of the three

members voting in favor of his termination were racially biased against African Americans;

and that the Board seemed to have had a predisposition to terminate him, prior to his

recommendation for termination by Dr. Connell.

Mr. Jackson does not, however, challenge the letters.  The court has reviewed the

briefs Mr. Jackson submitted in opposition to the Board's first motion for summary judgment

and to this one, and the court finds no effort by Mr. Jackson to meet the letters head on and

rebut them. Mr. Jackson has taken the approach that the letters are protected statutory expression. But as the court's discussion *supra* demonstrates, these letters are not within the ambit of § 2000e-3(a).

Little doubt can be raised that the caustic and inflammatory nature of letters such as Mr. Jackson's would motivate a reasonable employer to take decisive action. Moreover, the court does not find the evidence in the record to establish sufficient proof from which it might draw an inference that the letter-writing as a reason is pretextual. The court recognizes that inferences might be drawn both from the fact that Mr. Jackson wrote letters for many years before the Board acted; as well as the memorandum written by Mr. Ragland in which it is stated "this might be what we have been waiting on to move toward taking action on Mr. Jackson." To conclude, however, that these facts support the inference of pretext would ignore the relationship between the Board and the superintendent. As noted both in the record and by the Eleventh Circuit in its opinion in this case, the Board cannot consider termination proceedings against an employee without a recommendation from the superintendent. The fact that a previous superintendent chose not to recommend termination based upon the letter-writing (thus precluding the Board from acting on the letter-writing) in no way detracts or makes suspect the eventual decision of *the Board*, following Dr. Connell's recommendation, to act on the letter-writing.[13] Mr. Duncan, the lone Board member who dissented at Mr. Jackson's termination hearing, explained at the

---

[13]Similarly, the inability of the Board to take action in the absence of a recommendation from the superintendent, and the fact that the Board in this case "did not act as a cat's paw or rubber stamp approving [Dr.] Connell's recommendation," isolate the Board's decision from any significant and defeating pretextual inferences that might be drawn from a letter Mr. Ragland sent to Dr. Connell only.

hearing that the failure of the previous superintendent to place the letters in Mr. Jackson's personnel file or recommend termination as a consequence of the letter-writing justified a refusal by the Board to terminate Mr. Jackson. He did not, however, believe the letter-writing did not warrant termination.

> I don't agree with the action Mr. Jackson took. I don't agree. I'll put that up front. But I disagree with the method we are proposing to terminate him. You know, you can be a position for twenty years and take no action. But you can come back in one night and say this should have happened or that should have happened. Why don't we take those necessary steps?
> He, Lance Grissett, stated he was getting ready to exit. His tenure was coming to an end. I take that as an excuse. I didn't hire him. This Board and the other Board didn't hire him to put off what should have been done five years ago for someone else to do.
> . . .
> As I reflect back on this hearing, I would agree that on the other good and just cause, due to the letters, we may have probable cause to cancel Mr. Jackson's contract. But I disagree on the length of time we let it go on. I totally disagree with that.

(Doc. # 124, Ex. 1, pp. 958-59). Mr. Jackson has failed to come forward and rebut this proffered non-discriminatory reason. And having reviewed the record as a whole, the court does not find substantial evidence warranting the inference of pretext. Accordingly, summary judgment on the discrimination claim is due to be granted.

### E.    Punitive Damages

Finally, the court addresses the Board's argument with respect to the availability of punitive damages. Of course, the issue of whether punitive damages are available for Mr. Jackson's Title VII claims is now moot. In the interests of completeness, however, the court briefly notes that, with respect to Mr. Jackson's remaining 1983 claim, punitive damages are unavailable against the Board under this claim as well. *See Garret v. Clarke County Bd.*

*of Educ.*, 857 F. Supp. 949, (S.D. Ala. 1994) ("Punitive damages are not available under §

1983 from a governmental entity.") (citing *Kubany v. School Bd. of Pinellas County*, 839

F.Supp. 1544, 1551 (M.D.Fla.1993) (citing *Kentucky v. Graham*, 473 U.S. 159, 167 n.13 (1985);

*Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981)); *cf. Bradley v. Richmond Sch. Bd.*, 416

U.S. 696, 718 (1974).

**V.    Conclusion**

The court will enter an appropriate order in conformity with this memorandum of

opinion.

Done, this _____30th_____ of April, 2002.



EDWIN NELSON
UNITED STATES DISTRICT JUDGE